**David HICKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70803.**

Court of Criminal Appeals of Texas, En Banc.

March 31, 1993.

Rehearing Denied June 30, 1993.

Reed Jackson, Fairfield, Pat Simmons, Groesbeck, for appellant.

Robert W. Gage, County Atty., Fairfield, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MALONEY, Judge.

Appellant was indicted and convicted in Freestone County on a charge of Capital Murder. TEX.PENAL CODE ANN. § 19.-03(a)(2). The indictment alleged that appellant caused the death of the deceased by beating and striking her with a blunt instrument in the course of committing a sexual assault. The jury answered the three issues submitted to it in the affirmative and the trial court assessed the death penalty. TEX.

CODE CRIM.PROC.ANN. art. 37.071. Direct appeal was had to this Court. TEX. CODE CRIM.PROC.ANN. art. 37.071(h). Appellant brings five points of error in this appeal.[1]

In his first and second points of error appellant complains of the admission of evidence and testimony relating to DNA testing in which a comparison was drawn between appellant's genetic characteristics and the genetic characteristics of sperm found on the deceased's body.[2] Appellant claims that such evidence was improperly admitted because it failed to meet the standards set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) and *United States v. Downing*, 753 F.2d 1224 (3rd Cir.1985).[3]

We recently addressed the admissibility of DNA evidence and the viability of the *"Frye* test", concluding that Rule of Criminal Evidence 702 governs the admissibility of novel scientific evidence, including evidence of DNA testing. *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992). Pursuant to Rule 702, the proponent of the scientific evidence must prove by clear and convincing evidence outside the presence of the jury that the proffered evidence is reliable and relevant.[4] *Id.* at 573; *Fuller v. State*, 827 S.W.2d 919, 930 (Tex.Crim.App.1992), *petition for cert. filed* (June 23, 1992). Once determined reliable and relevant, such evidence is admissible unless the trial court determines that its probative value is out-

---

1. We note that appellant labels each of his complaints as a "ground of error"; we shall refer to each as a· "point of error". *See* TEX.R.APP.P. 210(b); TEX.R.APP.P. 74(d).

   We also note that appellant filed a pro se brief raising four additional points of error attacking the constitutionality of TEX.CODE CRIM.PROC. ANN. art. 37.071 and the effectiveness of his counsel in failing to make such a challenge at trial. Although appellant is not entitled to hybrid representation, *Miniel v. State*, 831 S.W.2d 310, 313 n. 1 (Tex.Crim.App.) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992), we have, in the interest of justice, reviewed appellant's pro se points and hold that they lack merit. Appellant's pro se points of error one through four are overruled.

2. Appellant's points of error one and two are as follows:

   *Ground of error number one*
   The trial court erred in admitting identification evidence of comparison of Appellant's genetic characteristics of human male sperm allegedly found in or on the decedent's body, which evidence was derived from a technique commonly known as "DNA testing" for the following reasons:
   1. This technique, at least in its application by the testing laboratory, fails to meet the standard for admissibility set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).
   2. This technique, at least in its application by the testing laboratory, fails to meet the standard for admissibility set forth in *United States v. Downing*, 753 F.2d 1224 (3rd Cir. 1985).
   *Ground of error number two*
   The trial court erred in admitting testimony of statistical (accuracy) probabilities of random or coincidental recurrence of identical or undiscerning similar matching of genetic characteristics of humans other than identical siblings for reasons that:

1. This technique, at least in its application by the testing laboratory, fails to meet the standard for admissibility set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).
2. This technique, at least in its application by the testing laboratory, fails to meet the standard for admissibility set forth in *United States v. Downing*, 753 F.2d 1224 (3rd Cir. 1985).

3. A Brief for Amicus Curiae and Supplemental Brief for Amicus Curiae were filed in support of appellant's first and second points of error. We will not separately address those briefs as our discussion in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim.App.1992), and in this case adequately disposes of the issues therein raised.

4. In *Kelly* we set forth the following steps to be followed by trial judges in determining the admissibility of expert testimony under Rule 702:
   [T]he "threshold determination" for a trial court to make regarding the admission of expert testimony is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. [citations and footnote omitted] Thus, in case such as this— where the trial court was faced with an offer of expert testimony a scientific topic unfamiliar to lay jurors—the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results.... If the trial judge determines that the proffered expert testimony is reliable (and thus probative and relevant), then she must next determine whether, on balance, that testimony might nevertheless be *un*helpful to the trier of fact for other reasons.... In short, if the trial judge determines that the proffered expert testimony is reliable and relevant, she must decide whether the probative value of the testimony is outweighed by one or more of the factors identified in Rule 403. *Kelly*, 824 S.W.2d at 572.

weighed by any of the factors identified in Rule of Criminal Evidence 403.[5] *Kelly*, 824 S.W.2d at 573; *Fuller*, 827 S.W.2d at 930.

The testimony concerning admissibility of DNA evidence was by agreement presented in the presence of the jury.[6] The State called Dr. Thomas Caskey, M.D., a medical geneticist and chairman of the Molecular Genetics Department at Baylor College of Medicine, who testified that the particular forensic technique utilized to analyze DNA, "restriction fragment length polymorphism" (RFLP) is the form of analysis employed by Lifecodes, the company that conducted the DNA tests in the instant case, and that RFLP is a reliable and widely accepted technique in the scientific community. Caskey testified that the United Kingdom's Scotland Yard has utilized the RFLP technique for some time and that the FBI is on the verge of adopting the RFLP method. Caskey further testified that he was familiar with Lifecodes' laboratory protocol and that the protocol was more than sufficiently rigorous to ensure reliable results. According to Caskey, a false positive finding was impossible because if the procedures were not correctly followed, no match could be obtained. Dr. Kevin McElfresh, Ph.D., a Lifecodes scientist and geneticist, called by the State testified as to the wide and virtually undisputed acceptance in the scientific community of the RFLP technique. McElfresh testified at length about Lifecodes' procedures, its method of analyses, that the procedures utilized had the ability to exclude suspects absolutely and that a false positive result was impossible. McElfresh further testified about Lifecodes' data base and the procedure utilized in determining the statistical frequency that a particular DNA fragment is found in the general population; that the chances of the DNA match found between appellant's DNA and the evidence DNA occurring in the North American Black population is one in ninety-six million and is one in seventy-seven million in the North American Caucasian population. Lorah McNally, the Lifecodes employee who conducted the analysis of the samples submitted in the instant case, testified about the process she had used in arriving at her conclusions. She holds a bachelor's degree in science and a master of science degree in forensic science. McNally stated that she isolated the DNA from sperm samples taken from the victim and compared those findings with DNA that she isolated from blood samples taken from each suspect, including appellant.[7] She testified that each individual tested, except appellant, was absolutely excluded as a suspect and that appel-

5. Rule of Criminal Evidence 403 provides that:

   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

6. Appellant filed a pretrial motion seeking to exclude DNA evidence. Thereafter, both parties agreed that they would forego a hearing on such evidence out of the presence of the jury. This agreement is evident in the following exchange:

   [THE STATE]: As the Court knows, one procedure for testing the validity of new scientific evidence is to have a hearing outside the presence of the jury, a very lengthy, time-consuming and expensive hearing. [Defense counsel] and I have had numerous discussions and neither one of us sees any prejudice to either party by having those hearings in front of the jury, so we have agreed to do that, with the exception that if it does appear during a particular point of those hearings that there might be some item that we need to take outside the presence of the jury, either one of us is free to do that. But because [defense counsel] has agreed to do that and will save, in my opinion, the county probably ten thousand dollars, I have agreed, subject to the Court's approval, that in the event that the Court does not allow the testimony concerning the results of the DNA analysis and finds that testimony to be unreliable and unacceptable, that the State would have no objection if the defendant asks for a mistrial.
   [DEFENSE COUNSEL]: That's my understanding.
   The trial judge agreed to proceed on the admissibility of the DNA evidence in the presence of the jury.

7. Blood samples were submitted of the following suspects: Robert Lee Porter, one of the deceased's neighbors; Emmett Spear, an insurance salesman who had visited the deceased's house the night of the murder and the following morning; Lester Busby, one of the deceased's nephews; Leo Hicks and Daniel Hicks, appellant's brothers; and appellant. Samples were taken of these individuals because they were all either at the deceased's house or in the general area of the deceased's house the night of the murder.

lant's DNA matched on all three "probes" tested with the DNA extracted from the semen. All of the State's witnesses were rigorously cross-examined on the potential for human error and questioned about the scientific certainty of the process used.

Following the State's evidence, appellant moved for an instructed verdict, alleging that the State's case rested entirely on the DNA evidence which did not satisfy the *Frye* test or the Rules of Evidence. The trial court overruled appellant's motion. Appellant then called Dr. Simon Ford, Ph.D., a molecular geneticist. Ford testified that he had completed his post graduate work in biochemistry, specifically studying the genetic material characteristic of certain bacterial contaminants. Although Ford stated that the basic technology involved in DNA typing is "very settled", he related problems that might occur when analyzing a forensic sample. Ford also testified that the data analyst must make certain "subjective" calls. Ford stated that he would not be comfortable finding appellant guilty solely on the basis of the DNA test results. On cross-examination Ford agreed that the chances of a false match due to contamination in Lifecodes' technique would happen "very infrequently."

■ Following the admission of all of the testimony from both parties on the DNA evidence and after taking appellant's objections to the evidence under advisement, the Court held: "the evidence is relevant, reliable and probably helpful for a fact finder [and that] ... the technique is generally accepted in the scientific community in which it's applied." Viewing the evidence in the light most favorable to the trial court's finding, we hold that the trial court did not abuse its discretion in finding that the State proved by clear and convincing evidence that the DNA evidence was relevant and admissible. See *Kelly*, 824 S.W.2d at 573–74; see also *Fuller*, 827 S.W.2d at 930. The State's witnesses, who were all exceptionally well-qualified, testified that the RFLP method of DNA forensic analysis utilized in the instant case was well accepted in the scientific community. The State's witnesses testified that a "false positive" was virtually impossible and

that the testing procedures utilized had the ability to exclusively rule out suspects. Although we said in *Kelly* that the DNA evidence must be proven relevant "outside the presence of the jury", appellant agreed to have the evidence presented in the presence of the jury before the court ruled on its admissibility, expressly waiving any right to have such evidence heard and ruled upon outside of the jury's presence.[8] Appellant's points of error one and two are overruled.

In his third point of error, appellant claims that the "evidence is insufficient to sustain the conviction as the State failed to prove, as alleged in the indictment and charged to the jury, that the instrument of death was unknown to the grand jury." Appellant argues that when an indictment alleges that the murder was committed by a means and weapon to the grand jury unknown, the State must prove that the grand jury, after efforts to do so, was unable to determine the kind of weapon used. Appellant points to evidence admitted at trial indicating that a hammer was the probable murder weapon and concludes that in the absence of evidence supporting the allegation that the nature and description of the murder weapon was to the grand jury unknown, appellant's conviction should be reversed and an acquittal entered. The State asserts that when, as here, the evidence reflects that no exercise of diligence on the part of the grand jury would have lead to greater certainty about the nature of the weapon used, then the failure of the grand jury to make such effort is harmless.

■ When an indictment alleges that the manner or means of inflicting the injury is unknown and the evidence at trial does not establish the type of weapon used, a prima facie showing is made that the weapon was unknown to the grand jury. *Matson v. State*, 819 S.W.2d 839, 847 (Tex.Crim.App. 1991). However, if the evidence at trial shows what object was used to inflict the injury, then the State must prove that the grand jury used due diligence in attempting to ascertain the weapon used. *Id.*

The indictment in the instant case alleged the following:

---

8. We note that appellant does not complain of this procedure.

... by beating and striking her with a blunt instrument, the exact nature and description of which is to the Grand Jury unknown ...

... by beating and striking her in the head and neck with a blunt instrument, the exact nature and description of which is to the Grand Jury unknown ...

... by beating and striking her with a hammer ...

... by beating and striking her with a blunt instrument containing an area of sufficient size shape, and weight [sic], to cause a ¾ inch circular and ⅝ inch semi circular skull fracture, the exact nature and description of which is to the Grand Jury unknown ...

... by beating and striking her in the head and neck with a blunt instrument containing an area of sufficient size, shape and weight to cause a ¾ inch circular and ⅝ inch semi circular skull fracture, the exact nature and description of which is to the Grand Jury unknown ...

... by beating and striking her with a blunt instrument the exact nature and description of which is to the Grand Jury unknown ...

... by beating and striking her in the head and neck with a blunt instrument the exact nature and description of which is to the Grand Jury unknown ...

The trial court's charge at guilt/innocence instructed the jury that:

... you must find from the evidence beyond a reasonable doubt that ... the defendant caused the death of [the deceased] by beating and striking her with a blunt instrument, the exact nature and description of which is to the Grand Jury unknown....

At trial, the State introduced into evidence a claw hammer that was found in a neighbor's yard several days after the murder. The hammer tested positive for the presence of blood, but the analyzing serologist testified that it could not be determined whether it was human blood. Dr. James Weiner, M.D.,

the pathologist who performed the autopsy on the victim, testified that although the victim's injuries were "consistent with" being struck with a hammer, there was no way to say absolutely that the hammer was the murder weapon. There was also evidence that a block of wood that had been used by the deceased as a door stop was utilized by the assailant in causing the deceased's death. Weiner testified that some of the deceased's injuries were consistent with having been inflicted by a block of wood. Weiner agreed that the evidence suggested that the decedent had been attacked at two different points in time—initially, in her bedroom where she sustained blows to the head consistent with being struck with a hammer but not fatal and then a couple of hours later when the assailant returned to sexually assault the victim in the kitchen and she sustained crushing blows to her head, causing death. Weiner did not testify as to what was used to cause the final blows to the victim's head. When asked to give his opinion as to the victim's cause of death, Weiner stated that "[the deceased] died as a result of multiple blunt force impacts of her head and neck."

■ Although the evidence indicated that some of the victim's injuries were consistent with being struck with the hammer admitted into evidence, some of the injuries were also consistent with being inflicted by a heavy block of wood. Also, it is not clear from the evidence what weapon was responsible for the crushing blows that finally resulted in the victim's death. Because the evidence is inconclusive as to the instrumentality that was responsible for the deceased's death, the State need not prove that the grand jury used due diligence in attempting to ascertain the murder weapon.[9] Moreover, the indictment's various allegations of the alternative possible instrumentalities that might have caused the deceased's death evidences the grand jury's efforts in attempting to ascertain the actual cause of death. In view of the uncertainty of the evidence offered at trial,

---

9. We note that Carter Kirven testified for the State that while in jail appellant confessed to Kirven that he and a cousin had killed the deceased with a hammer and knife. However,

Kirven did not report this conversation with appellant until October 24, 1988, several days after the indictment was returned on October 19, 1988.

we hold that the evidence was sufficient to support the jury's finding that the appellant "caused the death of [the decedent] by beating and striking her with a blunt instrument, the exact nature and description of which is to the Grand Jury unknown...." Appellant's third point of error is overruled.

In his fourth point of error appellant alleges that "[t]he trial court erred in admitting into evidence photographs of the deceased that were highly prejudicial and unnecessary, and were merely intended to inflame and incite the jury." Appellant complains of the admission of State's Exhibits 17, 19 and 20, 8 × 10, color photographs of the victim at the crime scene, and of State's Exhibit 30, a 3 × 5 black and white photograph of the victim's face taken at autopsy.[10] Exhibit 17 shows the victim in the condition in which she was found lying on the floor of her kitchen, except that she had been rolled over onto her back. The photo is taken from the victim's right side and shows most of the victim's body above her knees. Postmortem animal scavaging activity is visible on the right side of the face and neck. The victim's undergarments appear to be pulled down to her thighs. Exhibit 19 is a close-up of the victim's head and neck, taken from her right side. As the pathologist, Dr. Weiner, testified, this photograph shows the damage to the victim's head caused by the assailant's blows and the postmortem animal scavaging activity. The victim's clothing is torn away from her neck and shoulders. Exhibit 20 depicts the victim's head and upper torso, taken from above and behind the body and showing both sides of the victim's face and a laceration of the skin on the victim's forehead which was not visible in Exhibits 17 or 19. Weiner testified that there was a skull fracture underlying the laceration. The victim's torn clothing is also notable in this photo. In all three of these photos, the victim's head is resting on a block of wood, which later disappeared from the crime scene and was never found. Weiner testified that the block of wood may have been used as a weapon by the assailant. Exhibit 30 is a frontal close-up

of the victim's face and neck. This is the photograph attached to the autopsy report, showing the identifying case numbers assigned to the victim and used to identify the person autopsied.

■■ Admissibility of allegedly inflammatory photographs is governed by the rules of evidence. In determining admissibility of photographs under Rule of Criminal Evidence 403, the following factors are relevant for consideration:

> ... number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed[, and] ... the availability of other means of proof and the circumstances unique to each individual case....

*Long v. State,* 823 S.W.2d 259, 272 (Tex. Crim.App.1991). Photographs "must have *some* probative value [which is not] substantially outweighed by its inflammatory nature." *Id.* Moreover, we have generally held that photos are admissible when verbal testimony as to the matters depicted in the photos is also admissible. *Hernandez v. State,* 819 S.W.2d 806, 819 (Tex.Crim.App. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Ramirez v. State,* 815 S.W.2d 636, 647 (Tex.Crim.App. 1991).

■■ The photographs are relevant to the State's case for purposes of proving that the victim died as a result of blows to the head and for purposes of demonstrating the sexual assault that accompanied the murder. *See Fuller v. State,* 829 S.W.2d 191, 206 (Tex. Crim.App.1992). The photographs are probative of the violent nature of the crime committed but are not so gruesome as to be unfairly prejudicial. *See id.* The photographs are not duplicative. Exhibits 17, 19 and 20 are the only photographs admitted into evidence that depict the victim at the crime scene. These photographs are of average size, 8 × 10, and each views the body from a different angle, focusing on different

---

10. Although the State notes in its brief that identical slides were also shown during testimony so that all of the jurors could view the photographs at the same time, it is not clear from the record which, if any, of the complained of photos were accompanied with an identical slide. We note that appellant does not complain of the slides.

injuries and on the state of the victim's clothing. Although the postmortem animal scavaging activity is visible in two of the three crime scene photographs and in Exhibit 30, Weiner testified in some detail, without objection, about the animal scavaging activity and the damage caused thereby. The photographs are not more gruesome than Weiner's description of the injuries. Exhibit 30, a small black and white photograph was attached to the autopsy report for identification purposes. This is the only facial shot of the victim from the autopsy that was admitted into evidence. Although it is clear from this photograph that a significant portion of the soft tissue and skin on the right side of the victim's face was destroyed due to the animal scavaging activity, excess blood has been cleaned from the victim's face and the photo is not gruesome or repulsive. We hold the trial judge did not abuse his discretion in admitting the photographs. Point of error four is overruled.

■ In his fifth point of error appellant claims "the trial court erred in admitting into evidence [at the guilt phase of trial] the transcription and tape recording of appellant's testimony before the grand jury, as said testimony constituted custodial interrogation and violated appellant's right to remain silent and right to counsel." [11]

While incarcerated in the Freestone County Jail pursuant to a complaint charging appellant with capital murder in the instant case, appellant sent a message to the prosecuting attorney that he wished to testify at the grand jury proceedings scheduled to take place the following day. The prosecuting attorney informed appellant's attorney of the request. Although appellant spoke to his court appointed attorney later that day, the attorney was not present the next day when appellant was brought before the grand jury pursuant to his request. The following transpired before the grand jury:

Q. [Prosecutor] Now, if I recall, you requested yesterday to the jailer that you wished to appear before the grand jury; is that correct?

A. [Appellant] With a lawyer, yes, sir.

Q. Okay. And we didn't ask you to come up here. This is your decision: Is that also correct?

A. Yes, sir.

Q. I am telling you now I don't care whether you come before the grand jury and talk or not: Do you understand that?

A. Yes, sir.

Q. You are accused of the offense of capital murder of [the deceased], aggravated sexual assault of her, and burglary of a habitation of her, of her house; all of which occurred in Freestone County, Texas between the hours of 7:00 p.m. on April 25, 1988 and 8:00 a.m. on April 26, 1988. You do not have an attorney present with you at this time. When you originally requested an attorney to be appointed for you, you gave that request in writing to the jury—excuse me—to the jailer. That was taken by me to Judge Bournais who appointed one James Val Fulcher to represent you; is that correct?

A. Yes, sir. But he's withdrawn.

Q. And he has filed—he has talked with you.

A. Yes, sir.

Q. And I will tell you for your information Mr. Fulcher has filed a motion to withdraw because he knew [the deceased] pretty well—

A. Yes, sir.

Q. —and feels like there is a conflict. I will tell you that Judge Bournais to my knowledge—and this is the best of my recollection—I do not believe that he has relieved Mr. Fulcher of that duty and responsibility. So I think from a technical standpoint at this time Mr. Fulcher is still your attorney.

I will tell you that you do not have a right to have a grand jury—attorney present with you in the grand jury room. Although if you wish you may have one out

11. This point of error essentially involves two separate issues, one, whether appellant voluntarily waived his rights prior to testifying before the grand jury and two, whether appellant invoked his right to counsel half way through his grand jury testimony. We will address these issues separately and in sequence.

in the hall to advise you prior to and during the questioning.

I will advise you that you do not have to make any statement. You have the right to remain silent and not make any statement at all. Any statement that you make may be used against you at your trial. Any statement you make may be used as evidence against you in court. That you have the right to have a lawyer present outside the grand jury room to advise you prior to and during questioning. And if you are unable to employ an attorney you have the right to have an attorney appointed to advise you prior to and during any questioning. And you also have the right to terminate the interview at any time.

Now, you have an attorney. You say Mr. Fulcher says he is not your attorney; is that correct?

A. Yes sir.

Q. *So if you wish you may turn around and walk out this door and not say anything to us. The grand jury is meeting on your case at this time. And so if you wish to talk before the grand jury it will be necessary for you to waive your right to have an attorney with you at this time. If you do not waive your right to have that then it will be inappropriate for us to visit with you.* So what are your wishes? Do you understand your rights?

A. Are you going to ask me some questions?

Q. I will ask you some questions. You will have an opportunity to make a statement. And then we will ask you some questions also. . . . Do you understand each of these rights I have explained to you?

A. Yes, sir.

Q. Do you wish to give up those rights?

A. Yes, sir.

Q. Including the right to consult with an attorney?

A. Yes, sir.

(emphasis added). Thereafter appellant testified.

The trial court held a hearing outside the presence of the jury to determine the admissibility of the grand jury testimony. Appellant objected to the admission of the testimony on the grounds that it referred to statements made in otherwise inadmissible custodial interrogations and also on the grounds that appellant's right to counsel had been violated.[12] The State agreed to delete portions of the testimony of "conversations that

---

**12.** We note that while appellant's point of error appears to complain of both Fifth and Sixth Amendment violations, his verbal trial objections were less clear. In his brief appellant argues only a Fifth Amendment violation of his right to counsel as implicated by *Miranda*. We will therefore address appellant's only complaint from a Fifth Amendment perspective.

During the suppression hearing, defense counsel initially stated "I really think the only part of this whole deal that's objectionable are certain excerpts toward the end that are based, in turn, on inadmissible matters." Later, defense counsel stated that "a goodly portion of this [grand jury testimony] is admissible", but objected that "the State can't bootstrap otherwise inadmissible custodial interrogation that wasn't properly handled by asking questions at a later hearing." The court did not make a ruling on the admissibility of the testimony that day, but wanted time to review the testimony and applicable law overnight. The following day, the State agreed to the deletion of all testimony that referred to statements made in otherwise inadmissible custodial interrogations. Defense counsel objected that there were other inadmissible portions:

 . . . beginning on line sixteen of page twenty, [appellant] has invoked his right to counsel. . . . And I submit to the Court that anything after line sixteen on page twenty is inadmissible because he has invoked—at that point invoked his right to counsel.

In addition, prior to the suppression hearing appellant filed a written "Trial Objection" wherein he stated:

 "Defendant objects to the admission of any evidence of custodial confessions or inculpatory admissions by Defendant for the reason that same were elicited while Defendant was in custodial detention and either no warning or inadequate warning was given as required by *Miranda v. Arizona*, [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], and Tex.Code of Crim.Pro. Art. 38.22, and for further reason that Defendant had no knowledge or had insufficient understanding of his right to counsel and to remain silent. Assistance of counsel was denied. Therefore, the confessions or inculpatory admissions were taken in violation of the Fifth and Sixth Amendments to the United States Constitution and Article 1 Section 10 of the Texas Constitution and should therefore be excluded from evidence under Article 38.23. Texas Code of Criminal Procedure."

were custodial in nature and not reduced to writing." The trial court also deleted portions of the testimony which it determined were more prejudicial than probative. The court concluded that the remaining testimony was voluntarily given and admissible.[13]

Portions of the State's instructions were confusing. Although appellant was informed that he had a right to an attorney to consult with him outside of the grand jury room, appellant's attorney was not present.[14] Appellant was also informed that his appointed attorney, James Val Fulcher, had filed a motion to withdraw as counsel, but that technically, Fulcher was still his attorney. Nevertheless, despite the inconsistencies in the State's instructions, the record as a whole establishes that appellant knew what his rights were and voluntarily waived those rights. The record demonstrates that appellant was advised that he was not compelled to make any statement at all, that if he nevertheless chose to make a statement, it could be used as evidence against him at trial, and that he could "terminate the interview at any time". Appellant was told that since he did not have an attorney present and the grand jury was meeting at that time, he would either have to forego testifying or waive his right to an attorney. Appellant expressed no confusion when informed of his rights; appellant stated that he understood those rights and chose to waive them. In the

hearing before the trial court appellant testified that he had an eleventh grade education and was familiar with *Miranda* rights, having been informed of those rights in other unrelated circumstances. Further, appellant initiated his appearance before the grand jury, volunteering his testimony.[15] We hold the trial court did not abuse its discretion in concluding that appellant knowingly and voluntarily waived his right to an attorney prior to his grand jury testimony.

Appellant also argues that at one point during his testimony he invoked his right to counsel and that any testimony after that point was inadmissible. Following a string of questions to which appellant responded "No answer", appellant stated, "I don't want to answer those questions without my lawyer." The trial court deleted "those questions" to which appellant had responded "no answer", and some of the testimony responding to other questions of a similar subject matter. A couple of pages of remaining testimony was not, however, excluded.[16] The question is whether the court should have excluded *all* of the grand jury testimony following appellant's statement concerning his lawyer.

▮▮▮ Once an accused asserts his right to counsel during custodial interrogation,[17] interrogation must cease until counsel is present. *Miranda v. Arizona,* 384 U.S. 436,

---

**13.** The transcript of the grand jury testimony that was admitted at trial appears as Appendix A to this opinion.

**14.** It is well settled that an accused does not have a right to appear before the grand jury deliberating on his case. *Rogers v. State,* 774 S.W.2d 247, 262 (Tex.Crim.App.), *cert. denied,* 493 U.S. 984, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989). In the absence of such a right, it follows that the State was not obligated to delay the grand jury proceedings until appellant's attorney could be present, so long as appellant was not *compelled* to testify.

**15.** The Supreme Court has referred to "initiation" of further interrogation by an accused as an inquiry "represent[ing] a desire ... to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). We note that

   ... the question whether a suspect initiates a conversation with the police and the question

whether he has waived the Fifth Amendment right to counsel are separate issues calling for separate analyses. Nevertheless, the analyses are not mutually exclusive... [T]he waiver of counsel should be knowing and voluntary under the circumstances *including the necessary fact that the accused, not the police, reopened the dialogue with the authorities* and *including the background, experience and conduct of the accused.*

*Janecka v. State,* 739 S.W.2d 813, 829 (Tex.Crim. App.1987) (emphasis in original) (citing *Bradshaw,* supra and *Edwards v. Arizona*).

**16.** Numbered pages 21 through 23 of the transcript of appellant's admitted grand jury testimony, Appendix A infra, comprises the portion of the testimony that was admitted following appellant's invocation of his right to counsel.

**17.** Although appellant voluntarily appeared before the grand jury, he was at that time in the custody of county law enforcement authorities as an inmate of the Freestone County Jail.

474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1981). Although an accused may thereafter initiate further communication and waive the right to counsel previously invoked, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation". *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *see also Jones v. State*, 742 S.W.2d 398, 404 (Tex.Crim.App.1987). If, however, the invocation of counsel is unclear, interrogation may continue *for the sole purpose* of determining "whether the accused indeed wants to consult with counsel or wishes to proceed without benefit of counsel." *Lucas v. State*, 791 S.W.2d 35, 46 (Tex.Crim.App.1989). In addition, in very narrow circumstances, interrogation need not cease where an accused has invoked a limited right to counsel *accompanied by* an affirmative statement expressing his willingness to otherwise go forward with the interview. *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).[18]

Here, appellant stated "I don't want to answer those questions without my lawyer." Even if this statement could be considered ambiguous, continued interrogation should have been for the sole purpose of determining whether appellant wished to invoke his right to counsel for all purposes thereafter or only with respect to certain questions. The continued interrogation on the merits was a violation of the principles set forth in *Miranda*, supra, and *Edwards*, supra. Moreover, appellant did not invoke a limited right to counsel so as to justify further interrogation under *Barrett*. Further interrogation following a "limited invocation" of the right to counsel is only warranted where the defendant's "limited requests for counsel ... [are] accompanied by affirmative announcements of his willingness to speak".

*Barrett,* 479 U.S. at 529, 107 S.Ct. at 832. Therefore, even if appellant's statement that he did not want to answer "those questions" could be considered a limited invocation of his right to counsel, in the absence of an affirmative statement indicating a willingness to respond to other questions without counsel, the interview should have terminated. Appellant made no affirmative statement that he wanted to answer other questions. Rather, he continued to respond "No answer" and "I don't want to answer that" to the questions immediately following his statement regarding his lawyer. The fact that appellant responded to some questions after that point does not demonstrate that he rescinded his invocation of his right to counsel. *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884–85. To continue with questioning was in violation of appellant's fifth amendment rights and accordingly the trial court erred in admitting any of the testimony following appellant's invocation of his right to counsel. The question now is whether that violation amounts to reversible error.

Improperly admitted evidence does not call for reversal if the reviewing court determines beyond a reasonable doubt that admission of the evidence did not contribute to the conviction or punishment. *Harris v. State,* 790 S.W.2d 568 (Tex.Crim. App.1989). This rule applies even in the case of an illegally obtained confession. *See, e.g., Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972) (error in admitting challenged confession was harmless in light of other evidence that was admitted, including other confessions); *Beck v. State,* 712 S.W.2d 745, 474 (Tex.Crim.App. 1986) (confession obtained in violation of right to counsel was harmless). The improperly admitted testimony consisted of appellant's statements that he had reason to sus-

---

18. In *Barrett,* the defendant, who had properly received *Miranda* warnings, repeatedly stated that he would not give the police a written statement, but that he had "no problem" verbally discussing the incident. *Id.* at 525, 107 S.Ct. at 830. The defendant gave an oral statement which was admitted at trial. The Connecticut Supreme Court held that the defendant had invoked his right to counsel for all purposes and therefore all questioning should have ceased. *Id.*

at 526–27, 107 S.Ct. at 830–31. The United States Supreme Court reversed, noting that the defendant's "limited requests for counsel ... were accompanied by affirmative announcements of his willingness to speak...." *Id.* at 529, 107 S.Ct. at 832. The oral confession was admissible because appellant had "made clear his intentions" to submit to oral interrogation. *Id.*

pect another person of having committed the instant offense, but that he was unwilling to divulge that information to the grand jury at that time and without some kind of "protection". Also admitted was appellant's statement denying the commission of the offense. Substantively identical testimony was admitted in the form of a tape recorded interview between appellant and Sergeant Bob Wilson, Deputy Sheriff of Freestone County.[19] In that interview, appellant repeatedly asserted that he was not responsible for committing the instant offense. Appellant stated that he knew who was responsible for the offense, but would not reveal the identity of the man without some "protection". Because substantively the same evidence was properly admitted in the form of the taped interview between appellant and Wilson, we conclude that the improperly admitted portion of the grand jury testimony was harmless. *See State v. Sterling,* 800 S.W.2d 513, 520 (Tex. Crim.App.1990) (improper admission of confession was harmless in light of second admissible confession containing substantively the same facts), *cert. denied,* —— U.S. ——, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991); *see also Milton,* 407 U.S. at 377, 92 S.Ct. at 2177–78. Point of error five is overruled.

Having held each of appellant's points of error to be without merit, we affirm the judgment of the trial court.

CLINTON, J., concurs in the result.

MILLER, J., concurs in point four and otherwise joins the opinion.

Appendix A

STATE OF TEXAS

VS.

DAVID HICKS

TESTIMONY OF DAVID HICKS

Robert W. Gage, County Dist. Atty., Fairfield,

BE IT REMEMBERED on the 21st day of September, 1988, the above entitled came on to be heard before the July, August, September Grand Jury for Freestone County, State of Texas. And the following proceedings were had, to-wit:

MR GAGE: This is Bob Gage. I am the county attorney. Would you raise your right hand, please. State your name.

MR HICKS: David Hicks.

(Mr. Hicks duly sworn.)

DAVID HICKS

after being first duly sworn by the county attorney, testified on his oath as follows:

DIRECT EXAMINATION

BY MR GAGE:

Q. Mr. Hicks, the grand jury has given me permission and requested me to administer certain warnings to you in their behalf, and to propound any questions that need to be asked to you in their behalf. And before we go forward with that I would like to tell you that sitting to my immediate left is the court reporter. And she is taking this down and transcribing it. In addition to that there are two tape recorders going at this time. So what you say, the questions asked you, and all these proceedings are being recorded: Do you understand that?

A. Yes, sir.

Q. I ask you to speak up.

A. Yes, sir.

Q. Now, if I recall, you requested yesterday to the jailer that you wished to appear before the grand jury; is that correct?

A. With a lawyer, yes, sir.

Q. Okay. And we didn't ask you to come up here. This is your decision: Is that also correct?

A. Yes, sir.

Q. I am telling you now I don't care whether you come before the grand jury and talk or not: Do you understand that?

A. Yes, sir.

---

**19.** Appellant does not contend that this interview was in any way improper or that this tape was improperly admitted.

Q. You are accused of the offense of capital murder of Ocolor Hegger, aggravated sexual assault of her, and burglary of a habitation of her, of her house; all of which occurred in Freestone County, Texas between the hours of 7:00 p.m. on April 25, 1988 and 8:00 a.m. on April 26, 1988.

You do not have an attorney present with you at this time. When you originally requested an attorney to be appointed for you, you gave that request in writing to the jury—excuse me—to the jailer. That was taken by me to Judge Bournias who appointed one James Val Fulcher to represent you; is that correct?

A. Yes, sir. But he's withdrawn.

Q. And he has filed—he has talked with you.

A. Yes, sir.

Q. And I will tell you for your information Mr. Fulcher has filed a motion to withdraw because he knew Ms. Hegger pretty well—

A. Yes, sir.

Q. —and feels like there is a conflict. I will tell you that Judge Bournias to my knowledge—and this is the best of my recollection—I do not believe that he has relieved Mr. Fulcher of that duty and responsibility. So I think from a technical standpoint at this time Mr. Fulcher is still your attorney.

I will tell you that you do not have a right to have a grand jury—attorney present with you in the grand jury room. Although if you wish you may have one out in the hall to advise with you prior to and during the questioning.

I will advise you that you do not have to make any statement. You have the right to remain silent and not make any statement at all. Any statement that you make may be used against you at your trial. Any statement you make may be used as evidence against you in court. That you have the right to have a lawyer present outside the grand jury room to advise you prior to and during questioning. And if you are unable to employ an attorney you have the right to have an attorney appointed to advise you prior to and during any questioning. And you also have the right to terminate the interview at any time.

Now, you have an attorney. You say Mr. Fulcher says he is not your attorney; is that correct?

A. Yes, sir.

Q. So if you wish you may turn around and walk out this door and not say anything to us. The grand jury is meeting on your case at this time. And so if you wish to talk before the grand jury it will be necessary for you to waive your right to have an attorney with you at this time. If you do not waive your right to have that then it will be inappropriate for us to visit with you. So what are your wishes? Do you understand your rights?

A. You are going to ask me some questions?

Q. I will ask you some questions. You will have an opportunity to make a statement. And then we will ask you some questions also.

A. Yes, sir.

Q. You understand each of these rights I have explained to you?

A. Yes, sir.

Q. Do you wish to give up those rights?

A. Yes, sir.

Q. Including the right to consult with an attorney?

A. Yes, sir.

Q. Mr. Hicks, if you wish we will go stark forward and just let you make a statement; then I will ask you some questions. Or do you just want me to ask you some questions?

Q. You can ask me.

A. Now you and Lester Busby I believe went to—how do you pronounce her first name? Is it Ocolor?

A. I thought it was Ocolor.

Q. Ocolor?

A. Yeah. I just called her Grandmother.

Q. And Ms. Hegger, Ocolor Hegger, was your grandmother; is that correct?

A. Yes, sir.

Q. On whose side?

A. My mother.

Q. Now, you I believe and Lester Busby went over to visit with her the night of April 26th, or that evening: is that correct? April 25th I believe, 1988?

A. Let me make sure. Yes, sir. The 25th. Wasn't at night though.

Q. About what time did you arrive there?

A. About 5:15.

Q. And who was with you at that time?

A. With me?

Q. Uh-huh.

A. Lester.

Q. What was your purpose of you going over to your grandmother's house?

A. Well, Lester went over there. I don't know what the purpose was. But he went over there.

Q. Didn't he have some money he wanted to give her?

A. I don't know.

Q. How long did you stay over there?

A. Lester?

Q. Uh-huh.

A. I don't know, five or ten minutes I guess.

Q. Then where did you go when you left there?

A. Up to Jessie Gibson's.

Q. And who was at Jessie Gibson's?

A. Jessie.

Q. How long did you stay at Jessie's house?

A. I don't know.

Q. Where did you go from Jessie's house?

A. I went home.

Q. You didn't go up to the Porter's place? Or is that the same place?

A. That's the same place.

Q. The Porters and the Gibsons—Jessie lives with the Porters?

A. Yes.

Q. And what were you doing while you were up there?

A. Up at Jessie's?

Q. Uh-huh.

A. I go out there all the time just to visit.

Q. Were you drinking any beer at that time?

A. No, sir.

Q. Who all was there when you were there?

A. I—we didn't go inside. Well, I just seen Jessie. Just me and Lester and Jessie.

Q. And what did you do when you left Jessie's house?

A. I went home.

Q. About what time did you leave Jessie's house?

A. I don't know. Maybe about 5:30 maybe. I don't know.

Q. How long did you stay at home?

A. About five minutes. I went and got something to eat.

Q. When you say "home" where do you mean?

A. Up to my daddy's.

Q. Is that by going on 1365 and turning—would it be turning—

A. Going 1365—

Q. —east?

A. —west, turning north.

Q. Okay. And you went up to—

A. I mean turning south.

Q. And you went up to his house?

A. Yes, sir. My daddy's.

Q. And your dad—what is his name?

A. Daniel.

Q. And he's known as Tom; is that correct?

A. Yes, sir.

Q. Who was there when you were there?

A. I just went in and got me a piece of chicken and left.

Q. When you went inside the house was there anybody home?

A. Nobody but my brother Daniel.

Q. Tell me about your brother Daniel. How old is he?

A. I don't know.

Q. And he was there by himself?

A. Yes.

Q. Where was he located?

A. In the front room.

Q. And you got a piece of chicken and left?

A. Yes, sir.

Q. What did you do after you left?

A. Went back down to Jessie's.

Q. What happened when you go to Jessie's? About what time was that?

A. I don't know. I don't have a watch. But then we left and went to the Line.

Q. How long did you stay at Jessie's before you left and went to the Line?

A. Maybe—maybe ten minutes maybe.

Q. How long were you gone to your dad's house?

A. How long was I gone to my dad's house?

Q. Uh-huh.

A. About five minutes I guess.

Q. How long has your dad lived in that location?

A. I guess—I don't know. I know it's twenty-six years anyway.

Q. Were you raised in that house?

A. I think so.

Q. Okay.

A. But I am not sure. I never asked.

Q. But you spent your childhood in that area and you are very familiar with the house and the surrounding grounds and—

A. Pretty much.

Q. —and Ocolor's house?

A. Pretty much.

Q. I guess when you were a kid you probably walked from your house over to her house back through the woods?

A. Sometimes. Most times we ride bicycles around the road.

Q. After you went to the Line as you say, who did you go with?

A. Me and Lester and Jessie.

Q. And when you say you went to the Line, exactly where did you go?

A. That's on 1365. I guess that's over in Limestone.

Q. When you say "the Line," are you talking about the county line?

A. The beer line.

Q. Where did you stop?

A. At the Line.

Q. What was the name of the establishment that you stopped at?

A. Chuck O Luck's.

Q. What did you do when you got there?

A. Bought some beer.

Q. Who bought the beer?

A. Me and Lester.

Q. Did you have any money?

A. I had about, I don't know, forty or fifty dollars on me.

Q. So Lester didn't buy the beer, but you—

A. We both bought the beer.

Q. You handed him the money?

A. No. We both went in and bought the beer.

Q. Okay.

A. He bought him his and I bought mine.

Q. Then what did you do?

A. Went back to Jessie's.

Q. How long did you stay at Jessie's at that point in time?

A. I don't know. I think we had—we had a half case left when we left. But I don't know how long we stayed.

Q. Who left?

A. Me and Lester. I took him home.

Q. You went to Lester's house?

A. Yes, sir.

Q. And you say you—

A. That's Grandmother's—that's my uncle's brother's house where Lester stays.

Q. Just a short distance from your grandmother's house?

A. Yes, sir.

Q. What were you driving at that time?

A. A '79 Thunderbird.

Q. Were you driving that when you left to go to your father's house also?

A. Yes, sir.

Q. How long did you stay at Lester's house?

A. I don't know. Maybe it was about—it wasn't before ten because I know I got home in enough time to watch the news.

Q. Now, on the way to Lester's house, as you got in the vicinity of your grandmother's house, did you see or hear anything that was unusual?

A. Well, I seen a car when I first went up to dad's house, a brown car.

Q. Uh-huh. Did you see anybody in that brown car?

A. Yes, sir.

Q. Who?

A. I didn't even pay them no attention. I just went up there and got some chicken. And when I come back it was gone.

Q. Could you tell what the race was?

A. Yes, sir, it was white.

Q. How many people were there?

A. One.

Q. Just one white?

A. As I was leaving out the insurance man was pulling in.

Q. Right.

A. He had two people in his blue truck.

Q. Okay. And that's what you saw as you were going in. Did you see anything else while you were at Lester's house or on the way to your grandmother's house as you

were taking Lester home? Or did you hear anything?

A. No.

Q. And I believe you gave a statement to Mr. Wilson that indicated, or else told Lester you thought you saw some white guy running across the field, did you not?

A. That's when we was parked. That's not going down there.

Q. Okay. Tell me exactly when that was.

A. That was when we parked and after we left down to Jessie's.

Q. So you went to Jessie's house.

A. And drunk some beer.

Q. Uh-huh.

A. Then we went down to Lester's.

Q. Okay.

A. And we parked outside in the car.

Q. Okay. Is that when you thought you heard some—

A. Yes. I heard a noise at Grandmother's.

Q. Okay.

A. Then I seen somebody running across the field I thought.

Q. From your ·grandmother's house?

A. Yes, sir. Running south.

Q. Could you tell what the race of that person was?

A. Yes. It was a full moon. It was a white man.

Q. No question in your mind about that?

A. No, sir. But we was drinking now.

Q. Yeah. But—

A. We had drunk, I don't know, maybe a case and a half.

Q. But in your opinion it was a white man?

A. Yes, sir. And I know I heard something.

Q. You mentioned that to Jessie I believe.

A. I mentioned it to everybody.

Q. I mean to Lester?

A. I mentioned it to everybody.

Q. So you stayed at Lester's house, and then you left and you went where?

A. I went home.

Q. About what time did you—

A. I don't know.

Q. —leave?

A. It wasn't ten.

Q. But it was in time for you to get home to watch the evening news that comes on at ten?

A. The nightly news.

Q. Did you stop by your grandmother's house at that time?

A. No, sir.

Q. I wonder, after you heard this noise and saw what you thought was a white guy running away from your grandmother's house, why didn't you think it better to stop by and check on her?

A. Well, he didn't, you know—I told him. And he said he didn't see it. So, you know, we was drinking. Maybe I thought maybe we was kind of tipsy. And plus, you know, they got some white cows out there and a white horse too. He said that's probably what it was.

Q. And so who was home when you got home?

A. At my house?

Q. Uh-huh.

A. Nobody.

Q. Where is your house located?

A. Well, I was staying on 509 Jackson then I think. Yeah. I think it was 509.

Q. Is that where you were living at that time on the 25th?

A. Yes, sir.

Q. And who was home when you got there?

A. Nobody.

Q. And how long—

A. I went and picked my wife up.

Q. Sir?

A. I went and picked my wife up over at Henrietta's and went home.

Q. So before you went home you went and picked your wife up?

A. Yes, sir.

Q. Who was Henrietta?

A. My wife's mother.

Q. And you picked her up and got back there in time to see the evening news; is that correct?

A. Yes, sir.

Q. When is it you first heard about your grandmother's murder?

A. See, the next day about, I don't know—I don't know what time it was.

Q. Do you remember talking to Mr—

A. C.J.?

Q. —Bob Wilson—

A. Oh.

Q. —on the 27th of April—about two days later—a day or so later after the body was discovered, and giving him a written statement.

A. Well, if I give him a written statement, you know—

Q. Let me show you this. It's got your name at the top and your signature at the back.

A. Yes, sir.

Q. Do you remember giving him that statement?

A. (Affirmative nod).

Q. And it is dated the 27th of April, 1988?

A. Yes, sir. That has to be mine.

Q. Mr. Wilson had asked you where you had been during the night of the 25th at that time; and you were telling him; is that correct?

A. Uh-huh.

Q. How come you left out that you had left the Porter's house and gone to your father's house?

A. To get some chicken. To get something to eat.

Q. I know. But you didn't put that in your statement. You left that out. Is there any particular reason for that?

A. He wrote it. He asked all the questions. He wrote everything down.

Q. You read it and signed it, didn't you?

A. Well, yes. Certainly there's a lot of stuff in there he didn't put down. He doesn't got in there I went and got me something to eat?

Q. No, not in this—

[the following testimony appears on numbered pages 21 through 23 of the transcript of appellant's admitted grand jury testimony]

A. Well, he should have, you know.

Q. Can you think of anybody that might have committed this offense?

A. I don't want to answer that.

Q. Do you have any reason to suspect any of your friends and relatives?

A. I am going to say yes to that.

Q. What would those reasons be?

A. No answer.

Q. Mr. Hicks, do you understand that this grand jury is determining whether or not to bring capital murder charges against you?

A. Yes, sir.

Q. And that if you have any information that would cast a doubt on your guilt, or give this grand jury another suspect to zero in on other than yourself, then it would be in your best interest to tell the grand jury what that information is?

A. Sir?

Q. I said do you understand that if you have any information that someone else might have done this, or that would give the grand jury some other suspect other than yourself, it would be in your best interest to give us that information?

A. Yes, sir, I do.

Q. And you do not want to give us that information; is that correct?

A. Not, sir, not at the time.

Q. So what you are saying is basically there isn't any information that you can give this grand jury that would help you?

A. No, sir. I am not saying that.

Q. That's all I have. Do you have anything else you want to tell the grand jury?

A. Yes, sir. There's something I want to tell them.

Q. Okay.

A. I want them to know that I didn't do this. But all I want is some protection, like when I tell who done this, because I know, you know. But I am not fixing to say nothing now.

Q. You are wanting protection, so that's why you are not telling us who did it?

A. Oh, yes, sir. If it's who I think. And I am not saying they done it. But, you know, they had to.

Q. We will be glad to give you that protection if you want to give us that information.

A. No, sir. I don't want to say anything right now.