COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-309-CR
  
  
DERRICK 
BERNARD ALLEN                                                     APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
  
  
------------
 
FROM 
THE 396TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        A 
jury convicted Appellant Derrick Bernard Allen of capital murder and, because 
the State did not seek the death penalty, the trial court sentenced Appellant to 
life imprisonment in the Institutional Division of the Texas Department of 
Criminal Justice. Appellant raises five issues on appeal, arguing that the 
evidence is legally and factually insufficient to support his conviction, the 
standard of review for factual sufficiency should be abrogated, the trial court 
allowed improper commitment questions during voir dire, and the trial court 
erred by overruling Appellant’s objections that the prosecutor struck at 
Appellant over the shoulders of trial counsel in final argument. Because we hold 
that the evidence is legally and factually sufficient and that the trial 
court’s error in allowing the State’s improper argument is not reversible, 
we affirm the trial court’s judgment.
Factual 
Background
        On 
January 2, 2001, Timothy was a thirty-seven-month-old child with cerebral palsy. 
He could neither speak nor walk, but he could cry and he could crawl. He would 
often become constipated and cry. Timothy lived in an apartment in Fort Worth, 
with his mother Trevina Scott, his five-year-old brother Cameron, and Appellant, 
his mother’s boyfriend.
        When 
Trevina Scott bathed Timothy on the morning of January 2, 2001, she did not 
notice any marks or bruises on his body. She spent the day at the apartment with 
the two children. Appellant returned to the apartment around 7:00 p.m. Trevina 
Scott fed Timothy between 7:30 and 8:00 p.m., and, according to her, Timothy was 
not complaining or upset about anything at that time. She put Timothy to bed 
around 8:00 p.m. At approximately 9:00 p.m., Trevina Scott’s cousin Schlenski 
Boney, and Laditria Johnson, Trevina Scott’s friend, arrived at the apartment. 
As Laditria Johnson walked into the bathroom, she noticed Timothy in his room 
crying softly because he was trying to have a bowel movement. Schlenski Boney 
later went into the bedroom where Timothy was located to make a telephone call. 
Timothy was not crying at that time, but he was awake and alert. Trevina Scott 
called her grandmother, Mama Vera, at about 10:00 p.m. to see if she still had 
any left-over New Year’s Day food. Trevina Scott, Schlenski Boney, and 
Laditria Johnson left for Mama Vera’s house between 10:00 and 10:15 p.m. 
Trevina Scott left Timothy and Cameron in Appellant’s care. Trevina Scott did 
not check on Timothy before leaving, but testified that he had no bruises before 
she left the apartment. To Trevina Scott’s knowledge, Appellant was the only 
adult in the apartment while she was away. The women stayed at Mama Vera’s for 
twenty to twenty-five minutes and no more than thirty minutes.
        Meanwhile, 
at 10:52 p.m., paramedic Paul Weis received a priority one call regarding a 
child having difficulty breathing. When Weis arrived at Trevina Scott’s 
apartment, Appellant greeted him and told him that Timothy had a cold and was 
having trouble breathing. Weis checked Timothy and determined that his hands 
were cold, his lips were blue, and his breathing was labored. Weis began 
preparing to take Timothy to the hospital.
        When 
the women arrived back at the apartment, the ambulance was still there. 
Appellant told Trevina Scott that Timothy had started throwing up some thick 
white stuff and then his lips “turned color.”
        Trevina 
Scott went with Timothy in the ambulance to the hospital. At Cooks Children’s 
Hospital, Timothy was placed in a special oxygen room.  Although he was 
conscious and alert, he had difficulty breathing and no detectable pulse.  
Doctor Kimberly Aaron, the treating pediatric physician, testified that 
Timothy’s lack of a pulse was not related to his cerebral palsy.  Trevina 
Scott testified that she was told to call Appellant to find out what had 
happened to Timothy.  When Trevina Scott called Appellant, he told her that 
Timothy was choking and spitting up.  Appellant said he gave Timothy some 
pickle juice in his bottle and that he started turning blue, so Appellant called 
911.  Trevina Scott denied that anyone had told them to give Timothy pickle 
juice or that she had ever given pickle juice to the child in the past. 
Appellant did not claim that Timothy had fallen.  Trevina Scott testified 
that she made the telephone call from the same room in the hospital in which the 
medical personnel were treating Timothy.
        Doctor 
Aaron determined that Timothy was losing blood from an organ in his belly. His 
condition deteriorated, and Doctor Aaron pronounced him dead at 1:57 a.m. on 
January 3, 2001.
        Doctor 
Aaron identified State’s exhibits numbers nineteen, twenty, and twenty-two as 
photographs of Timothy on January 3, 2001, at the end of the resuscitation 
efforts.  She testified that the patten of bruising visible in State’s 
exhibit twenty-two was “very characteristic for a bruising pattern that occurs 
in a child who is punched with a fist.”  She also testified that Timothy 
had rib fractures and that they were particularly significant because a 
child’s ribs are very pliable; thus, the amount of force required to break a 
child’s rib is massive.  A child could fall out of a second story window, 
she said, and not have a break.  The reason the broken ribs were 
significant was that a child could suffer massive internal organ injuries to the 
heart, lungs, spleen, and liver even without having a rib fracture because the 
ribs will compress when hit and the underlying organs will be damaged. She 
denied that the fractured ribs were caused by the resuscitation efforts.
        When 
Trevina Scott told Appellant that Timothy had died, Appellant started 
screaming.  When Trevina Scott told Appellant that the police believed he 
had something to do with Timothy’s death, Appellant began shaking.
        The 
autopsy showed that Timothy had a healed rib fracture, recent rib fractures, and 
multiple liver lacerations.  The cause of death was determined to be acute 
massive bleeding due to the liver lacerations and an abdominal blunt-force 
injury.
Legal 
Sufficiency
        Appellant 
argues that the evidence is legally insufficient to support his conviction 
because the indictment alleges that Appellant struck the complainant with or 
against an object unknown to the grand jury, but that there was no testimony 
regarding what the grand jury determined or attempted to determine regarding the 
means of death.
        The 
State argues that, since the Texas Court of Criminal Appeals handed down Gollihar 
v. State,[1] the rule requiring the State to show 
that the grand jury exercised due diligence in determining the instrumentality 
of the defense is no longer relevant to a reviewing court’s analysis of legal 
sufficiency of the evidence. At least two of our sister courts have held that 
the due diligence inquiry is not an essential element of the offense, relying on 
Gollihar.[2]  Pre-Gollihar case law 
provided, if the evidence at trial fails to establish what instrument or weapon 
was used, a prima facie showing is made that the instrument or weapon was 
unknown to the grand jury.[3]
        In 
the case now before this court, Dr. Nizam Peerwani, Tarrant County Medical 
Examiner, testified that he could not be certain of the instrumentality of 
death. Dr. Aaron testified that while the rib fractures were consistent with 
being punched, it was also possible that the bruises were caused by being 
slammed up against an object. Former police officer Leyden Anderson testified 
that he thought the complainant’s fatal injuries were caused by a punch, 
although he was not completely certain. No witness testified with certainty of 
the instrumentality of death. Consequently, even under prior case law, the State 
would not be required to show the grand jury exercised due diligence in seeking 
the instrumentality of death.[4]
        No 
witness testified with certainty regarding the instrumentality of death. There 
was no variance, therefore, between the proof at trial and the charging 
instrument, which alleged death was caused by an instrument unknown to the grand 
jury.  We hold that the evidence is legally sufficient to support the 
jury’s verdict.  We overrule Appellant’s first issue.
Factual 
Sufficiency
        In 
his fifth issue, Appellant argues that the standard of review for factual 
sufficiency challenges in effect at the time he filed his brief is more 
demanding than the standard of review for legal sufficiency challenges.  He 
also argues for the abrogation of the standard in favor of a standard less 
demanding than the legal sufficiency challenge.  The Court of Criminal 
Appeals recently clarified the factual sufficiency standard in Zuniga v. 
State.[5]  We leave it to that court to adopt 
a new standard.  We overrule Appellant’s fifth issue.
        In 
his fourth issue, Appellant argues that the evidence is factually insufficient 
to support the jury’s verdict. In reviewing the factual sufficiency of the 
evidence to support a conviction, we are to view all the evidence in a neutral 
light, favoring neither party.[6]  The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt.[7]  
There are two ways evidence may be factually insufficient: (1) the evidence 
supporting the verdict or judgment, considered by itself, is too weak to support 
the finding of guilt beyond a reasonable doubt; or (2) when there is evidence 
both supporting and contradicting the verdict or judgment, weighing all of the 
evidence, the contrary evidence is so strong that guilt cannot be proven beyond 
a reasonable doubt.[8]  “This standard 
acknowledges that evidence of guilt can ‘preponderate’ in favor of 
conviction but still be insufficient to prove the elements of the crime beyond a 
reasonable doubt.”[9]  In other words, evidence 
supporting a guilty finding can outweigh the contrary proof but still be 
insufficient to prove the elements of an offense beyond a reasonable doubt.[10]  In performing a factual sufficiency review, we are 
to give deference to the fact finder’s determinations, including 
determinations involving the credibility and demeanor of witnesses.[11]  We may not substitute our judgment for that of the 
fact finder’s.[12]
        A 
proper factual sufficiency review requires an examination of all the evidence.[13]  An opinion addressing factual sufficiency must 
include a discussion of the most important and relevant evidence that supports 
the appellant’s complaint on appeal.[14]
        Appellant 
traces the timeline for the events of the night the complainant was 
injured.  Appellant called 911 at 10:52 p.m. Dr. Aaron thought Timothy 
would have become symptomatic ten or fifteen minutes after receiving his 
injuries.  Dr. Peerwani thought the complainant would have become 
symptomatic approximately thirty minutes after receiving his injuries.  If 
Dr. Peerwani’s testimony, which is more favorable to Appellant, is taken as 
true, and if Appellant called 911 as soon as the complainant became symptomatic, 
the injury occurred around 10:22 p.m.  Trevina’s Scott’s testimony 
indicated that she left for Mama Vera’s house between 10:10 and 10 :15 
p.m.  Trevina Scott returned home at approximately 11:20 p.m., having left 
Mama Vera’s around 11:09 p.m.  But Appellant argues that Trevina Scott, 
her cousin, and her friend must have been present when the complainant sustained 
the injury that caused his death.
        Additionally, 
Dr. Peerwani testified that the complainant had an old broken rib dating from a 
minimum of one to two months to approximately a year earlier.  Appellant 
argues that because Trevina Scott had known Appellant only eight or nine months, 
there was a reasonable chance that the complainant had suffered the broken rib 
before Appellant came into Trevina Scott’s life.  Appellant also argues 
that Trevina Scott was hostile toward CPS because she had reason to fear 
CPS.  Additionally, he argues that Schlenski Boney and Laditria Johnson had 
no loyalty toward Appellant and might fear indictment if they sided with 
Appellant.
        Appellant 
argues that, viewing the evidence in a neutral light, there is a reasonable 
doubt that Trevina Scott, Laditria Johnson, and Schlenski Boney were all present 
when the complainant was injured.  He argues that his conviction and 
Trevina Scott’s exoneration both rest squarely on the testimony of Trevina 
Scott, Laditria Johnson, and Schlenski Boney.  Consequently, he argues, a 
rational juror would retain a reasonable doubt about their credibility.  We 
defer to the jury’s determinations about the credibility of the witnesses.[15]
        Based 
on our review of the evidence detailed above under the appropriate standard of 
review, we hold that the evidence is factually sufficient to support the 
jury’s verdict.  We overrule Appellant’s fourth issue.
Commitment 
Questions On Voir Dire
        In 
his second issue, Appellant argues that the trial court improperly allowed the 
State to ask and receive responses to a lengthy series of improper commitment 
questions.  The series of questions to which Appellant objected at trial 
and of which he complains of on appeal dealt with venire members’ attitudes 
toward circumstantial evidence.  Specifically, the prosecutor asked whether 
the venire members would refuse to convict a person of capital murder when the 
evidence was circumstantial.
        Appellant 
argues that the prosecutor’s questions asked for a commitment from the venire 
members.  The questions did not ask the venire panel to commit to 
convicting based on circumstantial evidence.  The questions sought to 
ferret out biases against the law that allows conviction based on circumstantial 
evidence.[16]  That is, as phrased, the 
questions did not ask the jury panel to promise to convict based on 
circumstantial evidence.  They asked whether the jury would refuse to 
convict based on circumstantial evidence.  While the state of the law on 
commitment questions is conflicting at best,[17] we 
hold that the State’s questions properly inquired into a bias against a 
portion of the law upon which the State is entitled to rely.  The trial 
court therefore did not abuse its discretion in overruling Appellant’s 
objections.  We overrule Appellant’s second issue.
Jury Argument
        In 
his third issue, Appellant argues that the trial court reversibly erred by 
overruling his objection that the prosecutor struck at Appellant over the 
shoulder of his trial counsel when, during final argument, the prosecutor stated 
that he was appalled and disgusted with defense counsel and claimed that defense 
counsel had argued that the offense should be excused because the complainant 
was worthless.
        The 
State contends that the argument was an appropriate response to Appellant’s 
jury argument. The relevant portions of the arguments are:
 
[DEFENSE CO-COUNSEL]: We have a very -- this is an incredibly tragic 
situation.  This kid --
 
[PROSECUTOR]: 
I object to the reference of “this kid.”  It can be the victim, it can 
be his name, but I object to that.
 
[DEFENSE 
CO-COUNSEL]: They call my client dirty and Brown and everything else.
 
                THE 
COURT: Overruled. Go ahead.
 
[DEFENSE 
CO-COUNSEL]: This child -- whatever [the prosecutor] wants me to call him. This 
child, I wouldn’t want to wish his life on anybody.  He was born into a 
situation where he was never going to have a good quality of life.  He had 
it all against him from the start.

And his life was tragically ended, and it was ended by somebody.  We are 
not going to tell you it was an accident or the doctors did it.  But it 
would be just as much of a tragedy to lock up the wrong guy for it.

And 
if you conscientiously apply the burden of proof and you look at the evidence, 
there are many reasons to doubt the State’s case.  And in that situation 
you have to vote not guilty.

The 
prosecutor then made the following arguments in closing:
  
[PROSECUTOR]: 
Ladies and gentlemen, this kid, this kid, the reason why we are here, his name 
is Timothy. . . . . He was a member of our community.  He was not 
garbage.  He was not a throw-away kid as [defense counsel] suggests.
 
He 
had the right to live in our community.  He had the right to be loved by 
his mother.  He’s not garbage.  His name is Timothy.  And 
Timothy is not here with us anymore.
 
And 
ladies and gentlemen, I am appalled and quite frankly I am disgusted that 
[defense counsel] would get up here and stand up here --
 
[DEFENSE 
CO-COUNSEL]: Your Honor, object to counsel’s striking at the Defendant over 
the shoulder of counsel.
 
THE 
COURT: Overruled.
 
[PROSECUTOR]: 
That because someone is born to poverty, that Trevina Scott was flat broke, 
she’s unworthy to have a child; that she doesn’t deserve to have a child; 
that if you don’t have enough money, if you don’t wear a suit, then you 
don’t get to have a child.

I guess [defense counsel] are the only people that deserve to have children in 
this community.  Is that what we say?  Is that the way it works?  
In China where you are limited to two children, is that the society we have 
become?  You are not worthy because you can’t have a job.
 
. 
. . .
 
[PROSECUTOR]: 
Did [Appellant] do it or did [Trevina Scott] do it?  The evidence is clear 
that the [Appellant] did it.  The defense attorney said, well, he was just 
Timothy.  He wasn’t going to amount to much.  He was just a 
throw-away kid.  He doesn’t deserve justice.
  
[DEFENSE 
COUNSEL]: Again, Your Honor, renew my objection.  That’s not what the 
defense attorney said.  That’s striking at the Defendant over the 
shoulder of counsel.
 
THE 
COURT: Overruled.
 
[PROSECUTOR]: 
Timothy deserved justice just as much as anybody else in our community.  If 
you should find the Defendant not guilty, you are telling me, the district 
attorney’s office, the Crimes Against Children Unit, the detectives, the 
police, don’t investigate any case involving special-needs children.  
They are not worthy of protection. They don’t deserve it.
 
You 
are also telling us that a circumstantial case -- in other words, a case where 
there isn’t a confession, where there isn’t an eyewitness to the beating, 
shouldn’t be investigated, shouldn’t be prosecuted because we can never, 
ever, ever tell who committed the crime.
 
That’s 
what a not guilty verdict would tell us, tell the community.  Is that the 
message that you want to send in the face of this evidence that’s so strong, 
so clear that that man, as [the prosecutor] called him -- because that’s what 
he is, Derrick Brown, Derrick Allen, Dirty, took Timothy’s life unmercifully 
on January 2.
 
THE 
COURT: Two minutes.
 
[PROSECUTOR]: 
Show Timothy justice.  He deserves it.  The Defendant committed this 
despicable crime. Hold him accountable based on the evidence.  Find him 
guilty of capital murder.  Thank you.
 
        The 
prosecutor clearly mischaracterized Appellant’s jury argument, improperly 
expressed his personal opinion regarding defense counsel’s arguments not 
objected to, and engaged in improper, unprovoked personal attacks on both 
defense counsel.  Consequently, the trial court’s overruling of 
Appellant’s objections to the attack on defense counsel during jury argument 
is error because the argument was not relevant, it injected personal opinion, 
and it violated the Texas Lawyers Creed.[18] 
Although we in no way condone the prosecutor’s argument, the error is 
nonconstitutional.[19]  It is therefore not 
reversible unless it affected Appellant’s substantial rights.[20]  The error did not affect Appellant’s substantial 
rights at the guilt-innocence stage because the evidence of Appellant’s guilt 
was ample.[21]  Similarly, because the sentence 
was automatically ascertained as a matter of law, the error did not affect 
punishment.  We are therefore compelled to hold that the improper argument 
does not constitute reversible error.  We can only hope that this result 
does not encourage such conduct by attorneys on either side of the bar.  We 
overrule Appellant’s third issue.
Conclusion
        Having 
overruled Appellant’s issues, we affirm the trial court’s judgment.
 
  
                                                                  PER 
CURIAM
 

PANEL F:   DAUPHINOT, 
LIVINGSTON, and MCCOY, JJ.
LIVINGSTON, 
J. concurs without opinion
MCCOY, 
J. concurs without opinion
PUBLISH
DELIVERED: 
September 2, 2004


NOTES
1.  
46 S.W.3d 243 (Tex. Crim. App. 2001).
2.  
See, e.g., In re A.J.G., 131 S.W.3d 687, 694 (Tex. 
App.—Corpus Christi 2004, pet. denied); Richards v. State, 54 S.W.3d 
348, 350 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d).
3.  
Rosales v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); Hicks v. 
State, 860 S.W.2d 419, 424 (Tex. Crim. App. 1993), cert. denied, 
512 U.S. 1227 (1994); Matson v. State, 819 S.W.2d 839, 847 (Tex. Crim. 
App. 1991).
4.  
Tidrow v. State, 916 S.W.2d 623, 630 (Tex. App.—Fort Worth 1996, no 
writ); Hicks, 860 S.W.2d at 424.
5.  
No. 539-02, 2004 WL 840786, at *4-9 (Tex. Crim. App. Apr. 21, 2004).
6.  
Id.
7.  
Id. at *7.
8.  
Id.
9.  
Id.
10.  
Id.
11.  
Id. at *4; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 
1997).
12.  
Zuniga, 2004 WL 840786, at *4.
13.  
Id. at *7, 9.
14.  
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
15.  
Zuniga, 2004 WL 840786, at *4; Cain, 958 S.W.2d at 407.
16.  
See Burden v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001) 
(providing that standard of review for sufficiency of evidence is same for 
direct and circumstantial cases); Kutzner v. State, 994 S.W.2d 180, 184 
(Tex. Crim. App. 1999) (providing same).
17.  
See Standefer v. State, 59 S.W.3d 177, 182 (Tex. Crim. App. 2001) (“To 
be proper, . . . a commitment question must contain only those facts 
necessary to test whether a prospective juror is challengeable for cause.”); Lydia 
v. State,117 S.W.3d 902, 906-13 (Tex. App.—Fort Worth 2003, pet. ref’d) 
(op. on remand) (Dauphinot, J., concurring) (“A mere inquiry into a 
veniremember's thoughts and opinions is not an attempt to commit that 
veniremember.”).
18.  
See Wilson v. State, 938 S.W.2d 57, 60-61 (Tex. Crim. App. 1996), abrogated 
on other grounds by Motilla v. State, 78 S.W.3d 352 (Tex. Crim. App. 2002); Felder 
v. State, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992), cert. denied, 
510 U.S. 829 (1993); Alejandro v. State, 493 S.W.2d 230, 231 (Tex. Crim. 
App. 1973); Texas Lawyer's Creed—A Mandate for Professionalism—“Order of 
Adoption,” 783 S.W.2d XXXIII.
19.  
See Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on 
reh’g), cert. denied, 526 U.S. 1070 (1999).
20.  
See Tex. R. App. P. 
44.2(b); Martinez v. State, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000); 
Mosley, 983 S.W.2d at 259.
21.  
See Martinez, 17 S.W.3d at 692-93; Mosley, 983 S.W.2d at 259.