Terry Joe BISHOP, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 09–94–319 CR, 09–94–320 CR.

Court of Appeals of Texas,
Beaumont.

Dec. 27, 1995.

Discretionary Review Refused
March 27, 1996.

Michael A. McDougal, Conroe, for appellant.

Daniel Rice, District Attorney, Conroe, Gail Kikawa McConnell, Asst. District Attorney, Conroe, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

These appeals are from convictions for Burglary of a Habitation and Aggravated Sexual Assault (three counts). Terry Joe Bishop was previously convicted and the jury assessed punishment for each of the offenses at confinement for life in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000, with the sentences to run concurrently. We reversed the convictions and the Court of Criminal Appeals affirmed. *Bishop v. State*, 837 S.W.2d 431 (Tex.App.—Beaumont 1992), *aff'd*, 869 S.W.2d 342 (Tex.Crim.App.1993). The reversal was based upon error in admitting evidence of Bishop's sexual practices and proclivities. Upon retrial, a jury convicted Bishop of all offenses. The court assessed the same punishment as before.

Bishop attacks each conviction with identical points of error: the charge authorized a conviction on a theory not alleged in the indictment, the charge authorized a conviction on a lesser burden of proof than set forth in the indictment, and the evidence was insufficient.

### The Alleged Charge Errors

■ Bishop's objections to the charge are being made for the first time on appeal, therefore, he must demonstrate the error is so egregious that it creates a harm that deprives him of a fair and impartial trial rather than simply error that is calculated to injure his rights. *Almanza v. State*, 686 S.W.2d 157, 172 (Tex.Crim.App.1985).

■ Both of Bishop's complaints about the burglary charge point out the indictment alleged Bishop entered the victim's habitation, without her consent, with intent to commit aggravated sexual assault, attempted and committed aggravated sexual assault, and contained the language "... and said defendant was then and there armed with a deadly weapon, to-wit: a knife, which in the manner of its use and intended use was capable of causing death and serious bodily injury...." His first complaint focuses on the general definition of aggravated sexual assault in the charge which delineated all the ways a sexual assault becomes aggravated. The application paragraph did not contain the phrase "and said defendant was then and there armed with a deadly weapon, to-wit: a knife, which in the manner of its use and intended use was capable of causing death and serious bodily injury." Bishop argues the indictment alleged a specific manner of aggravation and the omission of that manner from the application paragraph allowed the jury to convict if they found any of the manners of aggravation under the general definition present. Thus, the jury was allowed to convict on a theory not alleged in the indictment.

Bishop's second complaint is the failure of the application paragraph to include the indictment language: "and said defendant was then and there armed with a deadly weapon, to-wit: a knife, which in the manner of its use and intended use was capable of causing death and serious bodily injury" lessened the State's burden of proof since the jury was not instructed they must find the aggravation allegation beyond a reasonable doubt.

Bishop relies upon *Cumbie v. State*, 578 S.W.2d 732 (Tex.Crim.App.1979) for both of these complaints. *Cumbie* holds it is fundamental error for the court to give a charge which permits conviction on proof different from, and sometimes less than, that required to prove the allegation in the indictment. *Id.* However, *Almanza* overruled *Cumbie* to the extent it held any charge error required automatic reversal. *Almanza*, 686 S.W.2d at 174. Therefore, if error, an *Almanza* analysis is required.

In response to both complaints, the State argues that since the application paragraph concludes with the phrase: "then you will find the defendant guilty of the offense of Burglary of a Habitation as charged in the

indictment", the jury was limited to the manner charged in the indictment and was required to find that manner beyond a reasonable doubt. Ironically, the State cites *Cumbie* for its position. However, no fundamental error was found in *Cumbie* because there was previous authority for the proposition that a charge may describe property, in a robbery charge, by reference to the indictment. The State has furnished no authority which addresses the issue in the context of Bishop's complaint.

We conclude the failure of the court's application paragraph to contain that language in the indictment was error. *See Williams v. State*, 612 S.W.2d 934 (Tex.Crim.App.1981) We must measure the actual degree of harm in light of, among other things, the entire charge, the state of the evidence, and the contested issues in the case. *Resendez v. State*, 860 S.W.2d 605 (Tex.App.—Corpus Christi 1993, pet. ref'd) The only contested issue in the trial was the identity of the perpetrator. The evidence was uncontradicted that the perpetrator entered the home without the consent of the victim, he placed her in fear of death, he used or exhibited the knife and he forcibly sexually assaulted the victim. Therefore, the evidence is overwhelming the perpetrator committed the offense of burglary of a habitation. The offense would have been completed simply with the intent to commit sexual assault. The charge error did not involve the identity issue, was not any comment on that issue, nor did it enlarge or lessen the State's burden to prove Bishop was the perpetrator. Consequently, we conclude it was not such egregious error as to require a reversal. These two points of error are overruled.

 Both of Bishop's complaints about the aggravated sexual assault charge concern the general definitions or statements of law. One complaint is while the application paragraph did follow the indictment in alleging the aggravation factors of (1) placing the victim in fear of death or serious bodily injury and (2) using or exhibiting a deadly weapon, the general definition of aggravated

sexual assault contained the additional means of placing a victim in fear of kidnapping. This allowed the jury to convict on a theory not alleged in the indictment. Bishop's other complaint is while the application paragraph did contain the indictment language "a person not the spouse of the defendant", the general statement of the law regarding aggravated sexual assault did not include that necessary language.[1] Where the indictment and the application paragraph contain the same requirements, there is no error if the abstract statement of the law differs. *See McDuffie v. State*, 854 S.W.2d 195, 221 (Tex. App.—Beaumont 1993, pet ref'd); *Mauldin v. State*, 628 S.W.2d 793, 796 (Tex.Crim.App. 1982). These two points of error are overruled.

### *Bishop's Insufficiency of the Evidence Claim*

Bishop argues strong suspicions and mere probabilities pointing toward the accused as the perpetrator are not sufficient to justify a conviction on circumstantial evidence. He points out in *Skelton v. State*, 795 S.W.2d 162 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990), the evidence showed the defendant had made threats against the victim and obtained dynamite and magnets similar to those used in the fatal bombing but there was no other evidence the defendant was responsible. The court held the evidence was insufficient to sustain the conviction and reversal and acquittal were required. *Id.* He also notes *Clarke v. State*, 785 S.W.2d 860 (Tex.App.— Fort Worth 1990), *aff'd*, 811 S.W.2d 99 (Tex. Crim.App.), *cert. denied*, 502 U.S. 946, 112 S.Ct. 390, 116 L.Ed.2d 340, *appeal after remand*, 813 S.W.2d 654 (Tex.App.—Fort Worth), *aff'd*, 839 S.W.2d 92 (Tex.Crim.App. 1991), *cert. denied*, 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993), held there was sufficient evidence to sustain the defendant's conviction of aggravated sexual assault, though the face of the assailant was covered before the victim was blindfolded, where the victim saw the assailant's skin was white, the

---

1. The legislature has now deleted this requirement. Tex.Penal Code Ann. § 22.021 (Vernon 1994 and Supp.1996).

assailant used duct tape to cover the victim's eyes and to secure her hands and feet, a fingerprint belonging to defendant was lifted from the duct tape, and sexual assaults of two others in which the defendant was implicated were placed in evidence to assist the jury in determining the identity of the assailant.

Bishop distinguishes *Clarke* as he views the evidence in the light most favorable to sustaining his point of error. He notes the victim could not identify her assailant as being white or black, although she could tell he had some sort of facial hair. She could not identify his voice, even though she lived across the street from Bishop. No fingerprints belonging to Bishop were found on anything in the victim's house. Bishop had no previous convictions or extraneous offenses to impeach his testimony or connect him to the offenses for which he was on trial. There was absolutely no physical evidence which connected Bishop to the crimes for which he was on trial. The fact that a card bearing his name, a pair of shorts similar to ones he owned, a part of a rubber glove, some part of a pair of panty-hose, and a knife similar to the one he had, with no other connections to him, other than their bearing a resemblance to items he may have had in his possession, is simply not enough to authorize the convictions against him. Furthermore, he argues, the complete lack of fingerprints, voice identification, body identification, hair samples, saliva samples, semen samples, etc. shows the evidence is insufficient to sustain the conviction.

### The Standard of Review

In reviewing the sufficiency of the evidence, the appellate court must review the evidence in the light most favorable to the verdict. *Villalon v. State,* 791 S.W.2d 130, 132 (Tex.Crim.App.1990); *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984). "[T]he test ... requires us ... to determine whether' after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime on other grounds beyond a reasonable doubt.'" *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim. App.1989), overruled by *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991), quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The test is the same whether the proof is made by direct or circumstantial evidence. *Geesa,* 820 S.W.2d at 160–161.

The trier of fact is the exclusive judge of the credibility of the witnesses, and an appellate court may not supplant that judgment with its own view of the testimony. *Adelman v. State,* 828 S.W.2d 418, 421 (Tex. Crim.App.1992).

### The Facts Under the Standard of Review

On September 6, 1990, C.R. had been separated from her husband for almost a year and was living at 132 Red Oak, Conroe, with her two children. Bishop and his wife lived across the street from C.R. at 127 Red Oak and had lived there for 7 or 8 years.

At approximately 4:00 a.m. on September 6, 1990, C.R. was awakened by a man in her bedroom who put a knife to her throat and told her she needed to be very quiet or he would kill her and her children. He also told her he knew she had two kids and was alone. The man had some type of rubber glove on one hand and a sock-like mitten on the other. He had a stocking covering his head and face, but C.R. could tell he had a beard, or several days growth of facial-hair growth, because there were hairs coming out of the stocking. He also smelled strongly of alcohol. The room was dark but C.R. could tell by the silhouette of the person's face, hair, and voice that it was a man. "It was not a kid." She could tell the man was probably a foot taller than she and was very similar in weight to her ex-husband. She was four feet, ten inches tall. There was nothing about the size of the man that was inconsistent with Bishop.

The intruder led C.R. to various rooms in the home where he sexually assaulted her vaginally, anally and orally. Throughout the ordeal her head was covered with her tee-shirt and, at various times, her ankles were bound. The intruder ran the knife down her back, cutting several of C.R.'s moles and leaving scrape marks on her back, and down

the front of her body, telling her he was going to cut her breasts off. The intruder struck C.R. several times and subjected her to other degrading and assaultive acts.

C.R. did not fight, "[b]ecause if I made any noise it would wake up my children, and he would have killed them." Although she did not see the knife, C.R. knew it was in the man's hand because "[i]t would be constantly moved up towards my neck." C.R. knew she needed to get the man out of her house, and told him "it was time for him to leave now because it was starting to get light and my children would be getting up soon." C.R. could see that it was getting near day by the light in the kitchen windows. The man responded, "No, I am not done yet," got up and walked towards the kitchen. C.R. assumed that he was going back for the knife which he did not have at that time. C.R. got up, bolted out the door, ran across her front yard and across the street to Kathy and Paul Magliolo's home. C.R. hoped the man would follow her; she did not care what he did to her once he was out of the house. However, the man did not follow her.

C.R. banged on the Magliolo's door. When Kathy answered the door, C.R. told Kathy there was a man in the house, the kids were still in the house and she needed Paul to go get him out. Paul grabbed his shotgun and ran over to C.R.'s house; Kathy called 911. While Kathy was on the phone with 911, Paul returned and sent C.R. to get his next door neighbor, Bishop, to help. C.R. went to Bishop's house and banged on his door. Although Bishop's truck was in his driveway and the lights were on in his house, C.R. got no response.

Although Bishop and his wife had lived across the street from C.R.'s house about seven or eight years, she did not know Bishop well on the date of the offense. She did not know Bishop well enough to know his voice, and the man who assaulted her had a very inconsistent accent and slurred speech. "He couldn't keep the disguise up." The man struck her with his right hand and held the knife in his right hand. Bishop is right-handed.

A vacant lot was next to the Magliolo's that was "very thickly grown up with under-brush." The "kids" played in there and could not be seen from across the street because the growth was so dense. There was only one trail through the vacant lot that the kids had made, and it was very small. Bishop could have left C.R.'s front yard, gone across the vacant lot and get into the utility clearing behind it and ran to his back yard.

While Kathy was on the phone with 911, Paul came back and yelled out to her to get help for him and to go get Bishop because he had a gun and could probably help. She and C.R. ran to Bishop's house and beat on the door "yelling at Terry to come out and help us." The blue truck Bishop usually drove was parked at his house. It was Kathy's opinion if something were happening outside in the neighborhood, Bishop would "always" come outside; it was unusual for him not to. However, Bishop did not come out even after Paul fired his gun to try to alert the neighbors and get help, although another neighbor did come out to help. The police arrived shortly thereafter.

Kathy did not hear a vehicle leave the area before the police arrived. She also testified she did not hear her dog bark that morning, so there were no strangers in the area. She said her dog and Bishop were "good friends."

Kathy recounted that Bishop's wife, Carol, came to her house about 11:30 p.m. on Saturday, two days after the assault. Carol wanted to know what was going on in the neighborhood, and Kathy told her, including that the police had found a black Jack Daniels cap and a pair of black shorts along with a knife. Carol was visibly shaken.

Paul corroborated most of Kathy's account of the morning events of September 6, 1990. However, Paul did notice the lights were on at Bishop's house as he walked through his own house after letting his dog outside. After rushing out with his shotgun, he ran to C.R.'s house but did not go in. He ran back across the street to Bishop's house because he knew Bishop had a gun, would be up, and could help. The truck Bishop usually drove was there, and the lights were on in Bishop's house. Paul banged on the door, dogs started barking inside the house, but Bishop did not respond. Paul turned to go back to

C.R.'s house, stopped, and fired a shot in the air to wake somebody and get more people out on the street. Bishop did not respond to the gun shot. Paul agreed it was unusual for Bishop not to respond because, "If there was anything going on in the neighborhood, Bishop was in the middle of it."

After the police arrived, Paul did not see Bishop and another man running naked down the street and get in a tan Dodge pickup truck. He did not see anybody on the street or any vehicle leave the street. After the police arrived, Paul went back to Bishop's house and noticed that the back gate was open and the lights were off. In his opinion, someone was in Bishop's house, and it was Bishop because "otherwise the dogs would have been barking." Paul said it would be possible for someone to be in the vacant lot next to him, go around the back to Bishop's house and not be seen. The vacant lot was very overgrown and one could not see through the lot to the house next door.

Conroe Police Officer Hill testified he secured the scene with barrier tape about 5:40 a.m. on September 6, 1990, and began taking photographs. Hill testified he noted pry marks beside the door between the utility room and the garage, and fresh paint chips below. Hill testified he found, among other things, a pair of black shorts in the area near the front entry; and a three-bladed pocket knife in the general area of the kitchen hall. Hill testified the telephone line going into the house was cut and he found a black baseball cap on the ground near the cut in the telephone wire. Hill also testified part of a torn rubber glove and a small card were later found in the pair of black shorts. The card read in part, "Your love was a love that is grateful, a love that continues to grow," and was signed, "I do love you Terry. Peanut"

Montgomery County Sheriff's Detective Hidalgo testified the knife recovered at the scene could be used as a deadly weapon. Hidalgo testified the doorknob from the entry door from the garage into the utility room of C.R.'s home, was "a typical type of a lock that you could probably jimmy with a card." Hidalgo also testified the card located in the black shorts found at the scene could be used to jimmy the lock. This card showed "indention and damage to one of the edges of the card that would be consistent with the type of damage that would be received if a card were to be used in such a fashion."

A Department of Public Safety (DPS) chemist analyzed and tested the evidence. The chemist detected no semen on any of the items, but was not surprised. C.R. testified the man did not ejaculate, "not that I could tell." A number of hair samples and other trace evidence were also collected for scientific analysis. None were found to belong to Bishop. Also, there were no fingerprints belonging to Bishop found at the scene.

Paul "P.K." Bell testified he had known Bishop about a year in September 1990 and would see him three to five times a week. On the evening of September 5, 1990, Bell went to Bishop's house to pick him up to go to a nightclub for a bikini contest. When Bell arrived, Bishop was wearing a dark-colored, black or blue, pair of shorts and a t-shirt. Bishop did not have any scratches on his legs. Prior to leaving for the club, Bell recalled Bishop making a statement: "I'm going to get some tonight if I have to take it."

Bishop and Bell proceeded to the night club, drank heavily, and stayed until closing. Bishop was drinking tequila and whiskey. They returned to Bishop's house. Bishop got out of Bell's truck, went to the garage door, hit the garage door opener, and went on in the house. After watching Bishop enter the house, he left.

Although they had plans to go back to the night club the next night, Bell did not hear from Bishop until Friday evening when he came home from work. Bell had two messages from Bishop on his answering machine. The first was distressed, "Come to Austin. I need you. I am in trouble." In the second, it was obvious that someone was with Bishop, "This is Carol, T.J. and Carol. Please come see us. Call me."

When Bell arrived in Austin, he found Bishop, who had always worn a beard and dark-tinted glasses, to be clean-shaven and wearing clear lens glasses. Bishop then related a story to Bell about being in trouble with a drug dealer and owing the drug-dealer

money; the dealer had threatened to kill him and Carol and had kidnapped him after he had returned home from their night out on Wednesday, the fifth. Bishop told Bell that when he left Bell the morning of the sixth, he walked around the side of his house, not through the garage, to the backyard where this drug dealer was sitting in a swing. The drug dealer put a knife to Bishop and took him into the house. The next thing Bishop knew, the house was surrounded by police and the dealer and Bishop were on the floor, naked. They both got up, still naked, hopped in the dealer's truck and drove off, with the police still all around.

Bell testified Bishop was serious when he told this story, but that he did not believe Bishop. Bishop told Bell the drug dealer's name was "Stinky or something," that he owed him about $6,000 and Bishop and the drug dealer drove in the truck to Round Rock and arrived at a hotel. Bishop also asked Bell to lie about a truck being at his house when they returned from the night-club. It was apparently Bishop's theory that the drug-dealer had set him up by raping C.R.

Bell and Bishop left Austin together. During this ride, Bell asked Bishop about the rape and did he do it. Bishop replied "he didn't think he did", he was kind of acting "I might have, but I am not sure." Bishop claimed he couldn't go to the authorities because the drug dealer would kill Carol. Bishop asked Bell to hide him out for a couple of days and they went to Bell's house. The next day the police came looking for Bishop. It took them two or three hours to get Bishop out of the house. On re-direct examination Bell testified Bishop was good at telling stories, tales and lies.

Carol Bishop was married to Terry Joe for five years. She was in Austin at a seminar on Wednesday, September 5, 1990. When she went back to her motel room around noon on Thursday, she found Terry Joe in her room. She was surprised to see him, "I tried to call him on Wednesday night and he wasn't there and I tried to call Thursday morning and I didn't get an answer." Terry Joe did not have a key to her motel room. Carol explained, "[h]e was pretty good at using credit cards" and could usually open a door with a card. Terry Joe had on clear glasses which he never wears. Carol testified Terry Joe can see without his glasses. Carol noticed some strange scratches and cuts on one of Terry Joe's legs "from his foot all the way up to his knee." The other leg was "just partially scratched. There were scratch marks from about middle ways of his leg up to his knee." Carol testified the scratches on Terry Joe's legs were consistent with him having a sock on one foot and not on the other.

On Friday they got ready to go to dinner and Terry Joe shaved off his beard. Carol testified, "He never shaves his beard. He has shaved it twice since I have known him." Terry Joe and Carol called P.K. Bell and Terry Joe asked him to come up on Saturday morning to go to the lake or something.

On Saturday Terry Joe told Carol and Bell that "there had been some problems in the neighborhood. He had talked to his sister and there had been a rape in the neighborhood and he might be involved." Terry Joe told Carol he was not going home with her because he needed time to find the person he thought was involved. Terry Joe said the man's name was Stringer, that he had been buying drugs from him and owed him $6,000. Terry Joe said he was buying "pills" and that they were in his truck. Carol testified Terry Joe had prescriptions for pain and anti-inflammatory pills that she filled for him on a regular basis. She testified she asked Bell where he and Terry Joe had gone Wednesday night. Bell told her they went to Johnny B. Dalton's on [F.M.] 1960. Carol had earlier asked Terry Joe where he was on Wednesday night and "he lied to me about it."

When Carol got back home, alone, she went to the Magliolo's to find out what had happened. The Magliolo's told her some things had been left at C.R.'s house. Carol testified she bought all of Terry Joe's clothes, washed them, and kept up with what was his. After leaving the Magliolo's, Carol took inventory and found a black Jack Daniels cap that was kept out in the garage by the door and Terry Joe's sole pair of Wal–Mart specials, size medium, black shorts were missing. Carol then checked Terry Joe's truck

for the pills he said he kept there but found none.

Carol identified the short's found at C.R.'s house as shorts like Terry Joe's; the hat found as exactly the kind of hat Terry Joe had; the Old Timer knife that her father gave her son which had "black stuff on the blades"; the card she gave Terry Joe when they first started dating and identified her name and signature; the gloves as gloves from a "package that you would color your hair with which Terry did every once in awhile" and the pantyhose as part of the pantyhose that she found stuffed under Terry Joe's boots when she was packing up his things. Carol also testified Terry Joe always carried the card she gave him which was found in the shorts.

Bishop testified in his defense. Bishop testified when he and Bell returned home from Dalton's he noticed a blue 1987 Chevrolet truck sitting in the driveway of a vacant house. He recognized the truck as belonging to either David Stringer or his cousin Ray. He testified when he and Bell pulled up in his driveway, his garage door was open. Bell got in his vehicle and left, and Bishop went into his house. He noticed the back door to his house was open and a light was on and figured that Ray or David Stringer had been to his house. Bishop testified Stringer had been to his house once before. Bishop found his dogs in the master bedroom. He did not find anyone in the house or anything missing. He did find a Coors Light beer can on the bar; Bishop testified he did not drink beer. Bishop pulled his boots off and went to sleep.

The next thing he knew Stringer was waking him up. Stringer was fully clothed, wearing a pair of overalls, no shirt, and sandals. Stringer said, "You need to get up. Don't answer the door or the telephone. I have been doing some work and there's cops all over here." Bishop looked outside and saw about four police cars. The time was about 5:40 a.m. About 7:30 a.m. someone came to Bishop's house but he did not answer the door; nor did he answer the telephone when it rang. When the police left, Stringer made a phone call and about 9:30 a.m., someone in an off-white Oldsmobile passenger car came to pick him up. Before leaving Stringer told Bishop to "chill out for a couple of days."

Bishop had met David Stringer in August 1989 through the "activities" of a chemist, a "meth cook" named Ian Evans. Bishop had an auto shop that wasn't making much money and he was talking with Ian and David Stringer about laundering money through his shop. He would receive "[t]en to fifteen percent off the top." Bishop became a "middleman"; he received packages at his shop that would be picked up by others. Bishop bought some Percodans and Mandrex for himself; running up a tab of about $6,000. After Stringer left, Bishop called his sister and asked her to give him a ride to the airport so he could fly to Austin and spend some time with Carol. The sister arrived in her brown Plymouth Voyager minivan and took Bishop to the airport.

Bishop testified he shaved his beard to alter his looks because he was coming back to Conroe to talk to his attorney. He did not tell Carol where he was going because he thought that she might be questioned by the police. Bishop further testified he did not immediately surrender to police when they arrived at Bell's house because he was trying to get in touch with his attorney. Bishop unequivocally denied being involved in the aggravated sexual assault of C.R.

### Our Review

Several portions of the evidence reflect directly upon Bishop's credibility:

1. Bishop told Bell an incredible story, with his house completely surrounded by police, both he and the drug dealer ran, naked, to the drug dealer's truck.

2. Bishop told Bell the tan-colored truck was in the driveway when they returned from the night club yet Bell testified differently.

3. Bishop told Bell he went around the side of the house to the back yard after they returned from the night club. However, Bell testified this was not true, he saw Bishop go through his garage and into his house.

4. Bishop told Bell he and the drug dealer drove to Round Rock, but testified he

called his sister to take him to the airport so he could fly to Austin.

5. Bishop admitted being involved in money laundering and drug dealing.

The following direct and circumstantial evidence, coupled with reasonable inferences therefrom, prove the identification of Bishop as the perpetrator:

1. Bishop's own testimony places him at his home during the time period.

2. The perpetrator knew C.R. was separated and lived alone with her two children. Bishop also knew these things.

3. The perpetrator had a short beard like Bishop's and was right-handed like Bishop.

4. There was nothing inconsistent with the perpetrator's and Bishop's build.

5. The perpetrator's breath had a strong odor of alcohol. Bishop drank heavily of tequila and whiskey, at the nightclub.

6. Bishop's black Jack Daniel's cap and black shorts were missing from his house when Carol took inventory of Bishop's belongings. The same items and an Old Timer's three-bladed knife, identified by Carol as her son's, were found at the scene.

7. Bishop always carried the card from Carol. That card, identified by Carol was in the pocket of the black shorts recovered from the scene.

8. Carol found part of a pair of pantyhose hidden under Bishop's boots. The perpetrator had hose covering his face.

9. Bishop had no scratches on his legs before going to the nightclub, but had scratches that were consistent with running through high brush with only one sock on after the assault. The perpetrator had a rubber glove on one hand and a sock-like thing on the other, indicating that the perpetrator had only one sock on.

10. The lights in Bishop's house were on when Paul Magliolo awoke, but the lights were off when the police arrived; Bishop's dogs were not barking, and Bishop's truck was parked in the driveway—indicating Bishop was at his house. Yet, Bishop, who would always be where the action was in the neighborhood, did not appear after Paul Magliolo, then Kathy Magliolo and C.R. pounded on his door to come help. Nor did Bishop appear after Paul Magliolo fired his shotgun.

11. Bishop could jimmy door locks, as he did the door lock of his ex-wife's motel room. C.R.'s doors had locks that could be jimmied open and it appeared the "love" card had been used to jimmy the locks.

12. Bishop's statement to Bell: "I'm going to get some tonight if I have to take it." indicates an intent to have sexual activity, forcibly if necessary.

13. Bishop asked Bell to lie and tell police a tan-colored truck was in his driveway when they returned from the night club.

14. Bishop shaved his beard and wore clear, rather than tinted, glasses to change his appearance.

15. Bishop held off the police for two to three hours before surrendering.

While Bishop did not raise sufficiency of the evidence in his former appeal, Chief Justice Walker did state: "Indeed, although both parties correctly characterize this case as being circumstantial in nature, we have not been presented with such strongly incriminating evidence in quite some time." *Bishop,* 837 S.W.2d at 432.

That observation is still correct. The evidence, viewed as a whole, establishes, beyond a reasonable doubt, the identity of the perpetrator of this brutal criminal episode as Bishop. Points of error five and six are overruled. The judgment is affirmed.