In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-07-00589-CR


____________________



JAMES ROBERT WILSON, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the Criminal District Court


Jefferson County, Texas


Trial Cause No. 90765






MEMORANDUM OPINION


 A jury convicted appellant James Robert Wilson of felony possession of child
pornography, and the trial court sentenced him to five years of confinement. Wilson then
filed this appeal, in which he raises five issues for our consideration. We affirm the trial
court's judgment.

Background


 Fatai Oyejobi, the network services manager for the Lamar University campus, 
testified that Wilson was employed as a senior network analyst in the IT department, and one
of Oyejobi's duties was to supervise Wilson. According to Oyejobi, Wilson at one time had
a flight simulation program on his computer, and Oyejobi instructed Wilson to remove that
software because it violated university policy. On March 4, 2003, Oyejobi was working late,
and he needed to enter Wilson's office to back up files Oyejobi had developed during the
day, and at that time, Wilson's computer was the only one that had a CD writer on it. Upon
entering Wilson's office, Oyejobi was unable to back up the files because when he attempted
to log on to Wilson's computer, he discovered that Wilson's computer was not on the Lamar
domain. Oyejobi explained that none of his department's computers should have been
isolated from the Lamar domain.

 As Oyejobi pondered why Wilson's computer was not on the Lamar domain, he
recalled the previous issue concerning Wilson's flight simulation software, and he decided
to determine whether Wilson's computer contained that unauthorized software by searching
the computer for picture files such as "J-Peg . . . that you use for . . . taking video to pictures,
or M-Peg for video pictures, or B-Map for . . . video digital pictures." Oyejobi did not find
the flight simulation software; however, he found various folders that contained either a
bitmap, JPEG, or MPEG files. One such folder was labeled "New Folder," and when
Oyejobi opened that folder, he discovered pictures of "naked children" and "obscene pictures
of male and female intercourse."

 Oyejobi testified that the computer was owned by the university, issued to Wilson, and
was not assigned to anyone else. According to Oyejobi, the computer tower assigned to
Wilson was never changed and was never borrowed by anyone else. Oyejobi testified that
Wilson never complained of anyone else accessing or using his tower or his laptop, or of any
remote attack on his computer. Oyejobi explained that he decided to reboot Wilson's
computer to see if he could back up the files as he had intended to do. Upon rebooting
Wilson's computer, Oyejobi discovered that the computer required a power-on (BIOS)
password, which was "only known to the person who operates the computer[,]" and
activating a power-on password was against the IT department's policy. Oyejobi explained
that Wilson's computer was connected to the network, but not the server.

 The next morning, Oyejobi discussed the matter with the director of the department. 
Ultimately, a meeting was conducted with various department heads, as well as
representatives from human resources and the Lamar Police Department, and Oyejobi
explained what had transpired the night before. Oyejobi then returned to the IT department
with the police chief, and they went to Wilson's office with Lieutenant Daniel Bowden and
Chief Dale Fontenot. Lieutenant Bowden escorted Wilson out of his office, and Oyejobi
located the pornographic images on Wilson's computer. After securing Wilson's office by
changing the lock and giving the only key to Chief Fontenot, Oyejobi and the officers left
Wilson's computer tower and laptop computer in the office.

 On cross-examination, Oyejobi testified that data cannot be placed in a computer
without the user knowing it if no one is using the computer. Oyejobi also testified that
viruses can sometimes destroy certain data on computers. However, Oyejobi explained that
information could be placed on a computer without the user's knowledge while the user is
surfing the internet. In addition, Oyejobi testified that in 2002, "[t]he only firewall [Lamar]
had . . . was on the edge, that is where all the computers on the campus connect to the
internet."

 Chief Fontenot of the Lamar University Police Department testified that after
participating in a meeting with various Lamar department heads concerning the incident with
Wilson, he went to Wilson's office with Oyejobi. Lieutenant Bowden met Chief Fontenot
at Wilson's office to offer assistance if needed. Oyejobi accessed some of the folders on
Wilson's desktop computer, and upon viewing the photographs, Chief Fontenot "quickly
noticed that they . . . appeared to be child pornography and that we had a violation of [the]
Penal Code." Chief Fontenot asked Lieutenant Bowden to escort Wilson to the police
department's office. The next day, Chief Fontenot and Lieutenant Bowden returned to
Wilson's office to recover evidence, and Lieutenant Bowden searched the office and took
both Wilson's computer tower and laptop into custody.

 Lieutenant Daniel Bowden testified that he met Chief Fontenot and accompanied him
to Wilson's office. While searching Wilson's desk, Lieutenant Bowden found pornographic
photographs, some of which depicted child pornography. Lieutenant Bowden obtained from
Wilson the passwords to Wilson's desktop computer and laptop, and he relayed that
information to Oyejobi. Lieutenant Bowden testified that he seized Wilson's desktop
computer and laptop. Lieutenant Bowden delivered the computers to Detective Jeffery Curl
of the Beaumont Police Department, who analyzed the computers and subsequently returned
them to Lieutenant Bowden. On cross-examination, Lieutenant Bowden testified that while
Wilson was at the Lamar Police Department's office, Wilson told him that Wilson's
computer contained pornographic pictures, but that the pictures were not illegal because he
had taken the pictures from a student's computer as evidence. Lieutenant Bowden testified
that he was unable to match Wilson's account regarding taking the pictures from a student
to any report that Wilson had made to the Lamar Police Department regarding such an
incident. When Lieutenant Bowden specifically asked Wilson whether the computer
contained child pornography, Wilson said it did not.

 Sean Patrick Stewart of the Lamar University Department of Data, Voice, and Video, 
testified that Oyejobi is his supervisor. Stewart explained that he discovered that Wilson's
computer was hooked into the network, but was not part of the domain, and Stewart
described the set-up of Wilson's computer as "completely outside . . . what the department
was doing as a whole. . . ." Stewart testified that Wilson's computer was basically walled
off unless Wilson allowed access to it. Stewart also testified that the use of a power-on
(BIOS) password on a State-owned machine "absolutely . . . should not have been done." 
Stewart explained that on some occasions when he visited Wilson's office, Wilson would
show him "mainstream pornography[,]" and the situation made Stewart uncomfortable. 
Stewart testified that on one occasion, Wilson showed him a photograph depicting a female
and asked Stewart whether he thought the female was "hot," and when Stewart responded
that he thought the female was cute, Wilson said, "You sick bastard. She's only 12," and
laughed.

 According to Stewart, Lamar University had a two-tiered system of firewalls in place
in 2003. Stewart explained that unless authorization had been granted, no one could go
through the firewall and share files without authorization from the person whose terminal
was being accessed. Stewart also testified that for someone from outside to access Wilson's
system, such a person would have to penetrate five levels of defenses: two firewall
appliances, the local antiviral software on Wilson's machine, Wilson's turn-on password, and
Wilson's administrative password to his operating system. Furthermore, Stewart explained
that viruses and bots are basically destructive to computers; they do not generally inject
information files into a computer.

 When later called as a witness by the defense, Stewart testified that from 2002-2003,
"the only firewall that [Lamar] had was at the edge of our network and in front of our
computer center. So, if you were on what we call the commodity or the portion of the
network that everyone is on, there was nothing to segregate [on-campus] users[.]" Stewart
also testified that a computer on Lamar University's campus had been found to have multiple
files placed on it by a "remote attacker," meaning the files came from a different machine,
but it could have been a machine at the university. Stewart also testified concerning various
work orders involving computers on campus that were infected with viruses, and that the
viruses were usually the result of either users not properly updating their machines' virus
protection, or visiting inappropriate websites. The defense stipulated that none of the work
orders involved Wilson's computers. Stewart explained that there were no virus reports
concerning computers assigned to Wilson. Furthermore, Stewart explained that Wilson was
a member of the intrusion detection team, so if there had been a problem with frequent
attacks from outside the firewall, Wilson would have been aware of it and would have known
how to protect his own machines.

 Detective Jeffery Curl testified that he is a forensic computer examiner with the
Beaumont Police Department, and that his job involves extracting evidence from computers
and digital media seized by officers and presenting the evidence in court. Detective Curl
testified that he received a desktop computer and a laptop computer from Lieutenant Bowden
and performed a forensic examination of the hard drives of both computers after interviewing
Lieutenant Bowden concerning the facts of the case. Detective Curl prepared an Excel
spreadsheet of the images that he found on the hard drive of Wilson's computer. Detective
Curl explained that "initially a user can set a file name; or if you're downloading an image
and you're just getting that file name as downloaded from the internet or from whatever
source and you're not actually creating that file name. So, it could go both ways." Detective
Curl further testified that a user can change a file name if he desires to do so, since "[i]t's
totally within your control." During his analysis of Wilson's computers, Detective Curl
identified numerous photographic and video images, many of which had file names that
contained references to both underage participants and sexual conduct. See Tex. Pen. Code
Ann. § 43.25(a)(2) (Vernon Supp. 2008) (definition of sexual conduct). (1)

 On the hard drive of Wilson's desktop, Detective Curl found a folder entitled "New
Folder" in the "3Com" directory, which Detective Curl testified was where one would
normally expect to find operating files. According to Detective Curl, when a user-created,
user-designated folder is found in a directory where it normally would not be found, "it
typically indicates that the user is attempting to hide the folder, because it's not a place you
would normally go to look for such a folder, particularly with this content." Detective Curl
explained that his analysis showed "access . . . to the hard drive on the desktop computer to
that very significant 3Com New Folder, and then the images contained within it. . . ." In
addition, Detective Curl testified that the internet history on Wilson's computer showed that
pornographic websites had been visited. According to Detective Curl, the "index.dat file"
on Wilson's computer revealed that files with names indicative of child pornography had
been accessed.

 Detective Curl explained that some of the activity concerning child pornography
involved folders in the computer's "E" (CD-ROM) drive, and "there's no virus . . . that's
capable of picking up a CD, placing it into a tray, accessing the images, opening the tray back
up, taking the CD out and placing it somewhere else. That takes a user to do that." Detective
Curl's examination of the computer revealed "[t]he continued access of a CD in the CD-ROM drive of the desktop computer of multiple file names that are typical of child
pornography. . . ." Detective Curl also explained that the media player on Wilson's computer
was utilized to access several movie files that represent child pornography.

 Dr. Tonya Renee Brown Nembhard, a pediatrician, testified that she reviewed several
images taken from the computer to determine whether the children in the images were under
eighteen years old. Nembhard explained that

 [t]he most objective criteria that I can use is what's called the 'Tanner Stage';
and that is different sexual maturation stages that we use as physicians to
determine where we are as far as that child's maturation and growth to
adulthood. At certain ages they're going to reach certain Tanner Stages, give
or take a couple of years to a couple of months. So, I can say definitely below
a certain Tanner Stage that [a] child is going to be less than 18.


Dr. Nembhard testified that approximately sixty State's exhibits contained images of children
under the age of eighteen, and that the images depicted either the genitals or the portion of
the female breast below the areola.

 Detective Brian Roach of the Kansas City, Missouri, Police Department, testified that
he works "strictly computer crimes, forensic computer recovery." Detective Roach explained
that during his work, he became familiar with a series of photographs depicting a female,
C.K., whose father was prosecuted in Missouri for photographing her and posting the
photographs on the internet. According to Detective Roach, the abuse began when C.K. was
six and concluded when she was thirteen, and the photographs depict C.K. from six years old
to thirteen years old. Detective Roach identified four of the State's exhibits as depicting
C.K.'s genitals in an obvious way while she was underage.

 Ranger Matt Cawthon of the Texas Rangers testified that he has investigated cases
involving the possession and distribution of child pornography. Ranger Cawthon identified
one of the State's exhibits as photographs of a female, D.W., whose father victimized her by
posting her photographs on the internet when she was approximately five years old.

 The defense called Cliff Woodruff, the Associate Vice President for Information
Technology at Lamar University, to testify. Woodruff testified that he has known Wilson for
approximately twenty years, and Woodruff was surprised when Oyejobi contacted him. 
Woodruff testified that he had never seen any indication that Wilson might be interested in
child pornography. In addition, Woodruff testified that Oyejobi is not capable of perpetrating
a fraud that would cause someone else to be subjected to criminal prosecution. Woodruff
characterized Oyejobi as quiet, honest, and "probably one of the more stable characters that
. . . I've run across. He's a fine man. And I have no reason to think that he would
deliberately do anything to hurt anybody else."

 Taylor Barry, the coordinator of network services for Tulane University, testified that
data can be placed on a computer without the user's knowledge. According to Barry, robot
viruses "can be taught or built to do anything." Barry testified that there would be
indications that unwanted data had been placed on the computer, such as data appearing that
Wilson had not put there, or the computer would slow down, become erratic, or have
"anomalous events[.]" Barry explained that downloads of unwanted information can occur
anytime a computer is on and connected to the network. Barry testified that the principal
difference between a virus and a bot is that a virus usually comes via an e-mail, and the user
has to click the attachment to activate the virus, whereas a bot enters the computer without
any action by the user. In addition, Barry explained that no password is totally secure, and
computers can be taken over by outsiders. Barry testified that for images to appear from the
CD drive, a user would have had to be present to put the CD in and remove it. Barry opined
that it did not appear that Wilson had attempted to hide anything because "[a]nybody who's
smart would have immediately named their folder something that you would never check[,]" 
but a folder named "New Folder" "sticks out like a sore thumb."

 On cross-examination, Barry testified that during breaks in the trial proceedings, he
had been speaking to Wilson's father, and that during their conversations, Barry had
characterized his role as a devil's advocate, and Barry stated that his job was to create
reasonable doubt. Barry testified that there had been no testimony regarding any difficulty
in the operating systems of Wilson's computers. Barry explained that although it was
"possible" that a hacker could penetrate the levels of security present on Wilson's computer,
the probability of such an occurrence was low. Barry also testified that the virus reports from
Lamar University did not show that either of the computers assigned to Wilson had been
infected with a virus. However, Barry also testified that Wilson had contacted Lamar
University's help desk in February of 2003, and reported that he was experiencing multiple
problems with his machine.

 Andrew Fision testified that he owns and operates a computer company called Fision
Computer Services. Fision testified that defense counsel retained him to examine a hard
drive and a laptop. Fision explained that his analysis did not reveal any evidence that Wilson
was the individual who placed the pornographic images on the computers. Fision testified
that he found viruses on the computers. Fision also testified that he entered the building
where Wilson's office was located through a side door, and he was able to walk through the
building at will.

 James Wilson testified that he did not intentionally or knowingly possess child
pornography. When asked how the images were placed on the computers assigned to him,
Wilson testified, "I can offer hundreds of scenarios where that could have happened. 
However, I do not have any direct evidence to say that one specific method was used." 
Wilson testified, "given that [the images] were located in the FTP folder and given the fact
that I had found user IDs in the FTP software that I did not create, I would have to guess that
it came in through the FTP server." In addition, Wilson testified that for a period of time,
he shared his laptop with Stewart, Oyejobi, and another colleague, Jeremy Landry. Wilson
explained that he received a new laptop on approximately October 15, 2002. Wilson testified
that he was not connected to the domain because "you do not need to be connected all the
time[,]" and he removed himself from the domain when he had to "do network management
of the switches, which . . . turned out to be a significant percentage of the time."

 Wilson explained that he "first suspected that there was something odd going on" with
his computer in August or September of 2002, but he did not report the problem because he
believed he could handle it himself. According to Wilson, Lamar University's firewall "had
a lot of holes in it." Wilson testified that he began to statically assign his IP address so that
he could monitor it in the packet shaper, and that"[i]n the course of two years . . . I stopped
personally at least 300 hacking attempts on my computer." Wilson explained that he did not
report the hacking attempts because "[t]here are hacking attempts all the time. If they were
to be documented, you couldn't build a building large enough to handle all the paperwork." 
Wilson also testified that he experienced viruses on his machine, but he did not report them. 
 Wilson testified that Jeremy remotely installed Daneware on his machine, and that co-workers frequently played such pranks. In addition, Wilson testified that he was only
allowed to lock his door at night when he left work, and students were allowed in to ask him
questions during the day. Wilson also testified that his FTP logs demonstrated attempts to
hack into his computer, and that user IDs had been added. Wilson testified, "at least two or
three times a week I noticed changes in my machine, changes in the size of the free space on
the hard drive, things of that nature[,]" but he explained that he did not feel it was necessary
to report his observations. Wilson denied commenting when he showed Stewart a
photograph of his girlfriend's daughter that she was only twelve years old.

 On cross-examination, Wilson testified the same people who hacked into his computer
must have printed twenty-nine images and put them in his desk. Wilson stated that he did
not recall telling Lieutenant Bowden that Wilson had seized some pornographic items from
a student's computer during the course of an investigation, but he had no reason to disbelieve
Lieutenant Bowden's testimony. Wilson testified that the investigation was "started but not
completed, not documented." Wilson testified that he never purchased pornography, but he
was a victim of identity theft. Wilson speculated that Oyejobi would have the determination,
skills, and motivation to place pornographic images on Wilson's computer. The defense
rested at the conclusion of Wilson's testimony.

 During rebuttal, Jeremy Landry testified that he worked as a network analyst with
Wilson, who was a senior network analyst. Landry testified that he never installed Daneware
on Wilson's computer. Landry also explained that Wilson removed himself from the
department domain, and that Wilson had a BIOS password on his computer. Landry stated
that he and Wilson were never involved in cases involving pornography seized from a
student's computer. In addition, Landry testified that Wilson never complained of
unexplained images or files appearing on his computer. Landry testified that no unexplained
pornography ever appeared on Landry's computer. Landry testified that on one occasion,
Wilson had a picture of a young lady, and after Wilson asked "a group of guys" about the
photograph, Wilson told the group that the girl was underage.

Issue One


 In his first issue, Wilson argues that he suffered egregious harm because the
application paragraph of the jury charge did not contain an element of the offense. Section
43.26(a) of the Penal Code provides as follows:

 (a) A person commits an offense if:

 (1) the person knowingly or intentionally possesses visual material
that visually depicts a child younger than 18 years of age at the time the image
of the child was made who is engaging in sexual conduct; and


 (2) the person knows that the material depicts the child as described
by Subdivision (1).


Tex. Pen. Code Ann. § 43.26(a) (Vernon 2003). Section 43.25(a)(2) defines sexual conduct
as ". . . actual or simulated sexual intercourse, deviate sexual intercourse . . . or lewd
exhibition of the genitals, the anus, or any portion of the female breast below the top of the
areola." Tex. Pen. Code Ann. § 43.25(a)(2) (Vernon Supp. 2008).

 The indictment alleged only the first element of the offense, and the application
paragraph of the jury charge also referenced only the first element. (2) However, the abstract
portion of the charge contained the following instruction, which discussed both elements of
the offense of possession of child pornography:

 POSSESSION OF CHILD PORNOGRAPHY

 A person commits an offense if the person knowingly or intentionally
possesses visual material that visually depicts a child younger than eighteen
(18) years of age at the time the image of the child was made who is engaging
in sexual conduct; and the person knows that the material depicts the child as
described herein.


 Wilson did not object at trial to the omission of the second element of the offense
from the application paragraph of the jury charge. Therefore, we may reverse the judgment
only if the error is so egregious that Wilson did not receive a fair and impartial trial. (3) See
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). In assessing
the degree of harm, we must consider the entire jury charge; the state of the evidence,
including contested issues and the weight of probative evidence; the argument of counsel;
and any other relevant information revealed by the record as a whole. Id. We must examine
the charge as a whole rather than as a series of isolated statements. Holley v. State, 766
S.W.2d 254, 256 (Tex. Crim. App. 1989); Iniguez v. State, 835 S.W.2d 167, 170 (Tex. App.--Houston [1st Dist.] 1992, pet. ref'd).

 During voir dire, the prosecutor emphasized that the case only involved possession
of child pornography. Defense counsel also pointed out on several occasions during voir dire
that the State carried the burden of proving beyond a reasonable doubt that Wilson possessed
child pornography. The prosecutor did not discuss the elements of the offense during his
opening statement. During his opening statement, defense counsel argued, "You've heard
the indictment read. And the crux of it is: Did Mr. Wilson intentionally and knowingly
possess child pornography? The evidence is going to show you . . . that these images are
child pornography. There's going to be no dispute on that. . . . What this case comes [down]
to, like I've told you, is: Did Mr. Wilson intentionally and knowingly possess child
pornography?"

 During the trial, the State introduced evidence that: Wilson removed his computer
from Lamar's domain; Wilson's computer required a power-on password; and Wilson's
computer was connected to Lamar's network, but not to the server; when Oyejobi attempted
to use Wilson's computer in Wilson's absence, he found a folder that contained photographs
of naked children; images that included child pornography were found in Wilson's desk; 
forensic analysis of Wilson's computer revealed a folder containing numerous photographic
and video images, many of which had file names that referenced both underage participants
and explicit sexual acts or nudity; the folder containing the images was found in an
unexpected location, which suggested to Detective Curl that Wilson was attempting to
conceal the folder; and some of the activity involving child pornography involved folders in
the computer's CD-ROM drive, which Detective Curl testified meant that a user must have
accessed the materials at the computer terminal.

 During closing arguments, defense counsel re-emphasized that "what the trial was
about was did Mr. James Wilson intentionally and knowingly possess any of that material...."

The prosecutor argued,

 there is no such thing as a porn fairy. Doesn't flit around throwing little
pictures on your drives and in your desk. Doesn't just happen. You go out
looking for it. You store it. You transfer it from one database to another. 
Sometimes you even delete it, thinking nobody will find it. But they did.

The prosecutor further argued, 

 So, when you eliminate every unreasonable uncommon-sense explanation,
what's left? How did those images get on his desktop, on his laptop, in his
desk drawers . . .? Where did all the other images come from to get here? 
Through his head, through his hands.


 And I submit to you . . . the defendant is guilty [as] charged in the indictment.


 Although the application paragraph of the charge did not set forth the second element
of the offense, the charge contained an accurate definition of the offense that included both
elements. At trial, the defense conceded that the images at issue constituted "child
pornography" (which by statutory definition depicts participants who are under the age of
eighteen) and only contested the issues of how the images came to be on the computers
assigned to Wilson and in his desk, and whether Wilson knew the images were there. See
Tex. Pen. Code Ann. § 43.26(a). In light of the arguments of counsel, the state of the
evidence, including the weight of the probative evidence, we find that the omission of the
second element of the offense from the application paragraph did not egregiously harm
Wilson. See Dinkins v. State, 894 S.W.2d 330, 339-40 (Tex. Crim. App. 1995) (The charge
was not defective when the application paragraph omitted the culpable mental state for the
aggravating murder when the culpable mental state was set forth in the abstract portion of
the charge.); Bishop v. State, 914 S.W.2d 200, 201-02 (Tex. App.--Beaumont 1995, pet.
ref'd) (Appellant was not egregiously harmed by omission of deadly weapon allegation from
the application paragraph.); Robertson v. State, 701 S.W.2d 665, 667-68 (Tex. App.--Houston [14th Dist.] 1985, no pet.) (Appellant was not egregiously harmed by omission from
the application paragraph of an element of the offense.). We overrule issue one.

Issues Two and Three


 In his second issue, Wilson contends the trial court employed an incorrect legal
analysis in overruling his motion for new trial, which was based upon newly discovered
evidence. Specifically, Wilson argues that the trial court applied the wrong legal standard
because (1) its order recites that "the admission of such evidence . . . would not in all
probability bring about [a] different result in another trial" when he was only required to
demonstrate that the evidence would "probably" bring about a different result, and (2) the
trial court found that the evidence was "speculative, conclusory, and unsupported by
independent, admissible and relevant evidence" rather than simply determining whether the
evidence was admissible and whether it was merely cumulative, corroborative, collateral, or
impeaching. In his third issue, Wilson asserts the trial court erred by overruling his motion
for new trial. We address issues two and three together.

 In his motion for new trial, Wilson asserted that after a previously unknown
individual, Cynthia Hunter, read about Wilson's trial in the newspaper, she contacted defense
counsel's office. Hunter informed counsel that while she was an employee of Chase Bank
in 2003, she was in contact with an employee of Lamar Institute of Technology, and she
began receiving e-mails containing child pornography. Hunter also informed counsel that
shortly after visiting Lamar University's website, she received two e-mails that contained
female teen pornography. Hunter immediately deleted the e-mails and reported the issue to
Chase Bank's IT department; however, she began receiving five to ten e-mails that contained
child pornography per day. Although Hunter called defense counsel's office before the jury
reached its verdict, counsel's office was unable to provide the information to counsel until
the jury had reached a verdict. Counsel attached a copy of Hunter's affidavit to the motion
for new trial. In the affidavit, Hunter averred that she began receiving the pornographic
images in August, September, and October of 2003.

 The trial court conducted a hearing on the motion for new trial, at which counsel
introduced Hunter's affidavit, but Hunter did not testify. The trial court denied the motion
for new trial and entered an order that provides as follows, in pertinent part:

 4. Ms. Hunter states in her affidavit that she began receiving e-mail items shortly after August, September, and October, 2003. 
Although she concludes the e-mail items contained child
pornography, which she deleted, such a conclusion is not
supported by statements in Ms. Hunter's affidavit, nor by any
other evidence presented by defendant. Although Ms. Hunter
states she received these items shortly after she corresponded by
e-mail with the Lamar Website, the defendant presents no
evidence connecting Lamar's Website to Ms. Hunter's receipt
of alleged pornography via e-mail. Also, Ms. Hunter's receipt
of alleged pornography occurred over six (6) months after [the]
defendant was caught in illegal possession of child pornography
in this case. Defendant fails to sufficiently connect any receipt
of pornography by Ms. Hunter to the facts presented in
defendant's case.


 5. Even if it can be argued that defendant's motion presents
significant newly discovered evidence, the trial court finds that
such evidence is speculative, conclusory, and unsupported by
independent, admissible and relevant evidence.


 6. Furthermore, the trial court finds that the admission of such
evidence as presented in defendant's Motion for New Trial
would not in all probability bring about a different result in
another trial. Among many facts presented at trial connecting
defendant to the items of child pornography found on his
computer, the State of Texas introduced numerous copies of
child pornography discovered near defendant's computer at his
Lamar workstation. Defendant's Motion for New Trial does not
refute this independent evidence which could support the jury's
verdict of guilt.


 Therefore, the trial court DENIES defendant's Motion for New
Trial.


 We review the trial court's ruling on a motion for new trial for abuse of discretion. 
Webb v. State, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); Lewis v. State, 911 S.W.2d 1,
7 (Tex. Crim. App. 1995). "We view the evidence in the light most favorable to the trial
court's ruling and uphold the trial court's ruling if it was within the zone of reasonable
disagreement." Webb, 232 S.W.3d at 112 (citing Wead v. State, 129 S.W.3d 126, 129 (Tex.
Crim. App. 2004)). Such motions are generally disfavored by the courts and are viewed with
great caution. Drew v. State, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987). Article 40.001
of the Texas Code of Criminal Procedure provides as follows: "A new trial shall be granted
an accused where material evidence favorable to the accused has been discovered since trial." 
Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon 2006). To obtain a new trial on the basis
of newly discovered evidence, a movant must show that:

 (1) the newly discovered evidence was unknown or unavailable to the
movant at the time of his trial;


 (2) the movant's failure to discover or obtain the evidence was not due to
a lack of diligence;


 (3) the new evidence is admissible and is not merely cumulative,
corroborative, collateral, or impeaching; and


 (4) the new evidence is probably true and will probably bring about a
different result on another trial.

 

Keeter v. State, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002) (emphasis added) (footnote
omitted).

 Hunter's affidavit refers to pornographic items she received after opening e-mails in
August, September, and October of 2003; however, the pornographic materials on Wilson's
computers were discovered in March of 2003. In addition, Detective Curl testified that his
analysis of Wilson's computers revealed that pornographic websites had been visited, and
that some of the pornographic images were loaded onto the computer via a disc inserted into
the E drive. Furthermore, Lieutenant Bowden testified that he found printed copies of
photographs that depicted child pornography in Wilson's desk. Applying the correct legal
standards as set forth in Keeter, we conclude that the evidence contained in Hunter's affidavit
probably would not have brought about a different result in another trial. See id. Therefore,
the trial court did not err in denying Wilson's motion for new trial. We overrule issues two
and three.

Issue Four


 In his fourth issue, Wilson argues that trial counsel provided ineffective assistance
because counsel "did not attempt to enter a stipulation that child pornography existed on the
computer assigned to Wilson" so that the jury would not have to view the photographs. 
Wilson contends that at the hearing on his motion for new trial, trial counsel "stated there
was no reasonable trial strategy for not obtaining a stipulation. . . ." At the hearing, trial
counsel testified that he had discussed the possibility of such a stipulation with the prosecutor
who was previously assigned to the case. Counsel explained that after that prosecutor
refused to enter such a stipulation, it was not trial strategy not to make the same request of
the new prosecutor; rather, it did not occur to counsel to raise the matter again when the case
was reassigned to the prosecutor who ultimately tried the case.

 To prevail on a claim of ineffective assistance of counsel, appellant must satisfy a
two-pronged test:

 First, the defendant must show that counsel's performance was deficient. This
requires showing that counsel made errors so serious that counsel was not
functioning as the "counsel" guaranteed the defendant by the Sixth
Amendment. Second, the defendant must show that the deficient performance
prejudiced the defense. This requires showing that counsel's errors were so
serious as to deprive the defendant of a fair trial, a trial whose result is reliable.


Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see
also Hernandez v. State, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Texas courts have
held that Strickland requires appellant to show a reasonable probability that, but for his
counsel's errors, the outcome would have been different. Bone v. State, 77 S.W.3d 828, 833
(Tex. Crim. App. 2002). "Appellate review of defense counsel's representation is highly
deferential and presumes that counsel's actions fell within the wide range of reasonable and
professional assistance." Id. Appellant must prove by a preponderance of the evidence that
there was no plausible professional reason for specific acts or omissions of his counsel. Id.
at 836. Furthermore, "[a]ny allegation of ineffectiveness must be firmly founded in the
record, and the record must affirmatively demonstrate the alleged ineffectiveness." 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The mere fact that another
attorney might have tried the case differently does not support a finding of ineffective
assistance of counsel. See Hawkins v. State, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983).

 In the case sub judice, there is no evidence that the prosecutor who tried the case
would have agreed to the stipulation at issue. In addition, assuming without deciding that
Wilson could meet the first prong of Strickland, Wilson has not demonstrated that but for
counsel's alleged ineffective assistance in failing to obtain a stipulation, the result of his trial
would have been different. See Bone, 77 S.W.3d at 833. Therefore, we overrule issue four.


Issue Five


 Wilson asserts in his fifth issue that the State failed to introduce evidence that the
children depicted in the photographs were unknown to the grand jury and that the grand jury
used due diligence to learn the children's identities. Wilson argues that because the State did
not prove that the grand jury used due diligence in attempting to ascertain the names of the
unknown children, "there is a fatal variance between the indictment and proof and the
evidence is legally insufficient to support a conviction for the offense charged."

 In this case, the indictment alleged that Wilson possessed "visual material that visually
depicted an unknown person, a child younger than eighteen (18) years of age at the time the
image of the child was made, engaging in sexual conduct; to-wit: lewd exhibition of the
genitals and portions of the female breast below the top of the areola[.]" At trial, the State
did not introduce evidence concerning the grand jury's efforts to ascertain the identity of the
individuals depicted in the materials; however, as previously discussed, the State introduced
evidence as to the identities of two of the individuals.

 As support for his argument, Wilson cites Hicks v. State, 860 S.W.2d 419, 424 (Tex.
Crim. App. 1993) and Coleman v. State, 918 S.W.2d 39, 41 n.1 (Tex. App.--Houston [1st
Dist.] 1996, aff'd Ex parte Coleman, 940 S.W.2d 96 (Tex. Crim. App. 1996). In Hicks, the
Court of Criminal Appeals noted that when the indictment alleges that the manner or means
of inflicting injury is unknown to the grand jury and the evidence at trial shows what object
was used to inflict the injury, then the State must show that the grand jury used due diligence
in attempting to ascertain the weapon used. Hicks, 860 S.W.2d at 424. In Coleman, the
Houston Court of Appeals relied upon Hicks, noting that "[w]hen the indictment alleges an
element or a fact is unknown to the grand jury and at trial the State proves a specific person
or specific means, the State must show the grand jury used due diligence in trying to
determine the element or fact that was unknown to the grand jury." Coleman, 918 S.W.2d
at 41 n.1. However, the rule set forth in Hicks is no longer viable. See Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997) (evidentiary sufficiency is measured against "the
elements of the offense as defined by the hypothetically correct jury charge"); see also
Rosales v. State, 4 S.W.3d 228, 230-31 (Tex. Crim. App. 1999). In the instant case, one of
the elements of the offense is that the visual material in Wilson's possession depicted a
person or persons under eighteen years of age when the image was made. See Tex. Pen.
Code Ann. § 43.26(a). The identity of such person or persons was not an essential element
of the offense. See id. Therefore, the evidence was legally sufficient, and there was no
"actual failure in the State's proof of the crime. . . ." See Malik, 953 S.W.2d at 240; see also
Tex. Pen. Code Ann. § 43.26(a). Accordingly, we overrule issue five and affirm the trial
court's judgment.

 AFFIRMED. 

 

 STEVE McKEITHEN

 Chief Justice

Submitted on November 11, 2008

Opinion Delivered January 14, 2009

Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.
1. Although the Legislature has amended section 43.25(a)(2) since the date of Wilson's
offense, the amendment does not substantively change the definition of "sexual conduct" as
it relates to Wilson's offense. See Act of May 29, 1999, 76th Leg., R.S., ch. 1415, § 22, 1999
Tex. Gen. Laws 4831, 4841 (amended 2003) (current version at Tex. Pen. Code 
Ann. § 43.25(a)(2)). Therefore, we cite the current version.
2. Wilson did not move to quash the indictment before trial or object when the
indictment was read to the jury.
3. The State concedes that charge error occurred, but argues that the error did not
egregiously harm Wilson.